Thomas A. Connelly (AZ Bar #019430)
Robert T. Mills (AZ Bar #018853)
Sean A. Woods (AZ Bar #028930)
**MILLS + WOODS LAW PLLC**
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
Telephone 480.999.4556
docket@millsandwoods.com

DeeAn Gillespie Strub (AZ Bar #009987)
**GILLESPIE, SHIELDS, GOLDFARB,
& TAYLOR**
7319 North 16th Street
Phoenix, Arizona 85020
Telephone: (602) 870-9700
Fax: (602) 870-9783
mailroom@gillaw.com
*Attorneys for Plaintiff*

MILLS + WOODS LAW PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014-2555
480.999.4556

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Jessica Fidler, an individual; and E.F., a minor, through his parent and guardian Jessica Fidler, | Case No.: CV-22-00300-PHX-DWL |
| Plaintiffs, | |
| v. | **SECOND AMENDED** |
| | **COMPLAINT** |
| State of Arizona, a government entity; Arizona Department of Child Safety, a governmental entity; Lisa Burns, individually and as an employee with the State of Arizona Department of Child Safety and John Doe Burns, her spouse; Melinda Quigley, individually and as an employee with the State of Arizona Department of Child Safety and John Doe Quigley, her spouse; Marisol Manjarrez, individually and as an employee with the State of Arizona Department of Child Safety and John Doe Manjarrez, her spouse; Kimmesha Edwards, individually and as an employee with the | **JURY TRIAL REQUESTED** |

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

State of Arizona Department of Child Safety, and John Doe Edwards, her spouse; Francisco Sanez III, individually and as an employee with the State of Arizona Department of Child Safety, and Jane Doe Sanez, his spouse; Bryan Adams, individually and as an employee with the State of Arizona Department of Child Safety, and Jane Doe Adams, his spouse; Michael Faust, as Director, Arizona Department of Child Safety, and Jane Doe, his spouse; Amber Lamonte, individually and as a services provider for the State of Arizona Department of Child Safety and, and John Doe Lamonte, her spouse, Drue Kaplan-Siekman, individually and as a services provider for the State of Arizona Department of Child Safety and, and John Doe Siekmann, her spouse; Phoenix Children's Hospital, Inc., an Arizona corporation, individually and as a services provider for the State of Arizona Department of Child Safety; Bo Borch-Christensen and Jane Doe Borch-Christensen, his spouse; Kathryn Coffman and John Doe Coffman, her spouse; Jason and Leigh Ann Treguboff; John and Jane Does 1-5; and Black Entities 1-5,

Defendants.

Plaintiffs Jessica Fidler and E.F.[1], (together "Plaintiffs") by and through their counsel, file this Second Amended Complaint against the Defendants the State of Arizona, the Arizona Department Of Child Safety, Lisa Burns and her spouse, Melinda Quigley and her spouse, Marisol Manjarrez, and her spouse, Kimmerha Edwards and her spouse, Francisco Sanez III and his spouse, Bryan Adams and his spouse, Michael Faust and his spouse, Amber LaMonte and her spouse, Drue Kaplan-Siekmann and her spouse, Bo Borch-Christensen and his spouse, Phoenix Children's Hospital, Inc., Kathryn

---

[1] E.F. is a fictitious name used to protect the identity of the minor.

Coffman and her spouse, Jason and Leigh Ann Treguboff, John and Jane Does 1-5, and Black Entities 1-5. Plaintiff states and alleges as follows:

## JURISDICTION AND VENUE

1.      Plaintiffs bring this civil rights lawsuit pursuant to the Fourth and Fourteenth Amendments to the United States Constitution, the Civil Rights Act of 1871, 42 U.S.C. § 1983, A.R.S. § 12-641, and Arizona common law.

2.      The amount in controversy exceeds the minimal jurisdictional limits of this Court.

3.      This Court has original subject matter jurisdiction over the claims made in this Complaint pursuant to Article 6, Section 14 of the Arizona Constitution.

4.      The acts and events giving rise to the causes of action alleged herein occurred in Maricopa County, Arizona, and all Defendants are subject to the personal jurisdiction of this Court in accordance with A.R.S. § 12-123 and as otherwise provided under Arizona law and the Arizona Rules of Civil Procedure.

5.      Venue lies in this Court pursuant to A.R.S. § 12-401 in that, among other reasons, the specific acts giving rise to the causes of action alleged herein occurred with primary effect in Maricopa County, Arizona.

## THE PARTIES

6.      Plaintiff Jessica Fidler ("Jessica") is an individual, a citizen of the United States, and a resident of Maricopa County, Arizona. At all times relevant to the present Complaint, Jessica resided in Maricopa County, Arizona.

7.      Defendant State of Arizona is a government entity that acts by and through its officials, employees, and agents, including, without limitation, each of the other Defendants in this action.

8.      Defendant the Arizona Department of Child Safety ("DCS") is a governmental entity that acts by and through its officials, employees, and agents, including without limitation, each of the other non-governmental entity Defendants in this action.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

9.      Defendant Lisa Burns ("Burns") is an individual who resided in Maricopa County, Arizona, at all times relevant to this Complaint. Burns was, at all times relevant to the present Complaint, an employee of the State of Arizona through DCS. At all times relevant to this Complaint, Burns was acting under the color of law as an employee of DCS. She is named herein in her individual capacity, as that term is used within the jurisprudence of the Civil Rights Act of 1871, 42 U.S.C. § 1983.

10.     Defendant Melinda Quigley ("Quigley") is an individual who resided in Maricopa County, Arizona, at all times relevant to this Complaint. Quigley was, at all times relevant to the present Complaint, an employee of the State of Arizona through the DCS. At all times relevant to this Complaint, Quigley was acting under the color of law as an employee of DCS. She is named herein in her individual capacity, as that term is used within the jurisprudence of the Civil Rights Act of 1871, 42 U.S.C. § 1983.

11.     Defendant Marisol Manjarrez ("Manjarrez") is an individual who resided in Maricopa County, Arizona, at all times relevant to this Complaint. Manjarrez was, at all times relevant to the present Complaint, an employee of the State of Arizona through the DCS. At all times relevant to this Complaint, Manjarrez was acting under the color of law as an employee of DCS. She is named herein in her individual capacity, as that term is used within the jurisprudence of the Civil Rights Act of 1871, 42 U.S.C. § 1983.

12.     Defendant Kimmersha Edwards ("Edwards") is an individual who resided in Maricopa County, Arizona, at all times relevant to this Complaint. Edwards was, at all times relevant to the present Complaint, an employee of the State of Arizona through the DCS. At all times relevant to this Complaint, Edwards was acting under the color of law as an employee of DCS. She is named herein in her individual capacity, as that term is used within the jurisprudence of the Civil Rights Act of 1871, 42 U.S.C. § 1983.

13.     Defendant Francisco Sanez III ("Sanez") is an individual who resided in Maricopa County, Arizona, at all times relevant to this Complaint. Sanez was, at all times relevant to the present Complaint, an employee of the State of Arizona through the DCS. At all times relevant to this Complaint, Sanez was acting under the color of law as an

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

employee of DCS. He is named herein in his individual capacity, as that term is used within the jurisprudence of the Civil Rights Act of 1871, 42 U.S.C. § 1983.

14.    Defendant Bryan Adams ("Adams") is an individual who resided in Maricopa County, Arizona, at all times relevant to this Complaint. Adams was, at all times relevant to the present Complaint, an employee of the State of Arizona through the DCS. At all times relevant to this Complaint, Adams was acting under the color of law as an employee of DCS. He is named herein in his individual capacity, as that term is used within the jurisprudence of the Civil Rights Act of 1871, 42 U.S.C. § 1983.

15.    Defendant Michael Faust ("Faust") is an individual who resided in Maricopa County, Arizona, at times relevant to the present Complaint. Faust was, at all times relevant to this Complaint, the Director of the DCS. At all times relevant to this complaint, Faust was the official policymaker for the DCS. He is named herein in his official capacity.

16.    Defendant Dr. Amber La Monte ("LaMonte") is an individual who resided in Maricopa County, Arizona, at all times relevant to this Complaint. At all times relevant to this Complaint, LaMonte provided contract services for the State of Arizona through the DCS. At all times relevant to this Complaint, LaMonte was acting under the color of law as a DCS service provider. She is named herein in her individual capacity, as that term is used within the jurisprudence of the Civil Rights Act of 1871, 42 U.S.C. § 1983.

17.    Defendant Drue Kaplan-Siekmann ("Kaplan-Siekmann") is an individual who resided in Maricopa County, Arizona, at all times relevant to this Complaint. At all times relevant to this Complaint, Kaplan-Siekmann provided contract services for the State of Arizona through the DCS. At all times relevant to this Complaint, Kaplan-Siekmann was acting under the color of law as a DCS service provider. She is named herein in his individual capacity, as that term is used within the jurisprudence of the Civil Rights Act of 1871, 42 U.S.C. § 1983.

18.    Defendant Phoenix Children's Hospital, Inc. ("PCH") is an Arizona corporation that was authorized to, and did, conduct business in the State of Arizona, including providing medical care services to children in the care and/or custody of DCS.

19.    Defendant Dr. Bo Borch-Christensen ("Borch-Christensen") is an individual who resided in Maricopa County, Arizona, at all times relevant to this Complaint. At all times relevant to this Complaint, Borch-Christensen provided services for Phoenix Children's Hospital. At all times relevant to this Complaint, Borch-Christensen was acting under the color of law as a medical service provider. He is named herein in his individual capacity, as that term is used within the jurisprudence of the Civil Rights Act of 1871, 42 U.S.C. § 1983.

20.    Defendant Dr. Kathryn Coffman ("Coffman") is an individual who resided in Maricopa County, Arizona, at all times relevant to this Complaint. At all times relevant to this Complaint, Coffman provided services for Phoenix Children's Hospital. At all times relevant to this Complaint, Coffman was acting under the color of law as a medical service provider. He is named herein in his individual capacity, as that term is used within the jurisprudence of the Civil Rights Act of 1871, 42 U.S.C. § 1983.

21.    Defendants Jason and Leigh Ann Treguboff ("the Treguboffs") are individuals who resided in Maricopa County, Arizona at all times relevant to this Complaint. Defendants were licensed foster parents at all times relevant to this Complaint. At all times relevant to this Complaint, the Treguboffs were acting under the color of law as a foster parents for the State. Jason and Leigh Ann Treguboff are named herein in their individual capacities, as that term is used within the jurisprudence of the Civil Rights Act of 1871, 42 U.S.C. § 1983.

22.    John and Janes Does 1-5 and Black Entities 1-5 are persons, agents, services, employees, business entities, partnerships, corporations, and/or unincorporated associations subject to suit in a common name whose true names are unknown to Plaintiff and who are, therefore, designated by fictitious names. Plaintiff will ask leave of the

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

6

Court to substitute the true names of the said parties prior to the entry of Judgement herein.

23.     Whenever in this Complaint reference is made to any act of "Defendants" such allegations shall be deemed to mean all named Defendants, John and Jane Does 1-5, and Black Entities 1-5, or their officers, agents, managers, members, representatives, employees, heirs, assignees, customers, tenants, and that they did or authorized such acts while actively engaged in the operation, management, direction, or control of the affairs of Defendants and while acting within the course and scope of their duties, except as specifically alleged otherwise.

24.     At all times herein mentioned and with respect to the specific matters alleged in this Complaint, Plaintiff alleges, upon information and belief, that each Defendant was and is the agent, employee, principal, employer, co-conspirator, or any combination thereof of each of the remaining defendants, vice versa, or both. In addition, Plaintiff alleges, upon information and belief, that the Defendants named herein, and each of them, are responsible in some manner for the occurrences herein alleged, and that each of the above Defendants conspired with, directed, ratified, approved, aided, abetted, jointly collaborated, or any combination thereof, each of the remaining Defendants in committing the acts herein alleged or failed to prevent such acts when having the power, duty, or authority to do so with full knowledge of said acts.

## FACTUAL ALLEGATIONS[2]

### I.    BACKGROUND

25.     E.F. (DOB 11/26/2011) is the natural child of Jessica.

26.     Jessica is the "sole" parent of E.F. who was conceived via intrauterine insemination using an anonymous sperm donor in March 2011 in Israel. Pregnancy complications developed subsequent to Jessica's development of pseudo tumor cerebri

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

---

[2] Plaintiff makes the allegations in this Complaint based upon personal knowledge as to those matters in which she had personal involvement and upon information and belief as to all other matters.

(excessive spinal fluid). E.F. was born three (3) weeks early via C-Section at Rambam Hospital in Haifa, Israel.

27.     Jessica was raised in Michigan and is raising E.F. in the Jewish faith.

28.     Jessica was 31 years old at the time of E.F.'s birth.

29.     Jessica holds a B.S. degree from Central Michigan University, a teaching certificate from David Yelling College in Jerusalem, and a M.A. from the University of Haifa in Haifa, Israel.

30.     Jessica worked as a teacher of applied linguistics while in Israel. She was employed full-time at Arizona State University and taught English as a second language from May 2013 until July 2017. She left this job to spend more time taking care of her son, whose illnesses were increasing at this time.

31.     Jessica was enrolled in the Paradise Valley Community College registered nursing program in January 2020; however, she was forced to leave the program due to DCS involvement and their removal of her child from her care. She will not be able to re-enroll in this program for 3 years due to the waiting list.

32.     Jessica is currently employed as a Parent Provider with Arion Health Services, which affords her the flexibility she needs to care for her son.

33.     Although Jessica is a single mother, she has not been alone in raising E.F. Jessica has an extended family network that has always loved and supported her and E.F. Jessica's unique challenges in raising a child with complex medical issues. She, like any loving parent, always put E.F. first. Jessica recognized when she needed help and asked for it.

34.     Jamie Fried ("Jamie") is Jessica's mother.

**II.     E.F. HAS SUFFERED WITH A VARIETY OF HEALTH ISSUES SINCE BIRTH, NONE OF WHICH HAVE BEEN EASY TO DIAGNOSE OR TREAT.**

35.     From birth, E.F. displayed confusing and concerning symptoms of illness that were difficult to characterize and diagnose.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

8

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

36.     At around three weeks old, E.F. began having seizure-like activity (episodes of sudden stiffening, arching and, at times, stopped breathing). From the very beginning, E.F. had feeding issues with nursing, complications with digesting various types of formulas. There were other signs that Jessica noted were "different" about him early on. For example, he was delayed in meeting developmental milestones, he did not thermo-regulate normally (at times hot, at times cold, but did not sweat), he rarely cried, frequent infections, and did not react to painful stimulation.

37.     E.F. did not sit up on his own until he was nine months old, which was attributed at that time to discomfort from putting pressure on the abdomen, colon, etc. Jessica reported that "she did not know what to think of it."

38.     In October 2012, when E.F. was 11 months old, Jessica and E.F. moved to Michigan to be closer to family and because she was having difficulties navigating the healthcare system in the Hebrew language.

### E.F.'s First Birthday

39.     On November 26, 2012, E.F. turned one.

40.     Just after his first birthday, in early December 2012, E.F. was seen by doctors at the Henry Ford Hospital in Michigan. Diagnoses made were gastroesophageal reflux disorder ("GERD"); (2) suspected Dandy-Walker syndrome as detected by Magnetic Resonance Imaging ("MRI"); and (3) suspected Sandifer's Syndrome as assessed by a neurologist. Dandy-Walker syndrome can cause seizures, abnormal breathing, slow motor development, abnormal intellectual development, and may even shorten life span.[3] Sandifer's Syndrome is a combination of gastro-esophageal reflux with spastic torticollis and dystonic body movements that look like seizures. [4]

---

[3] NIH U.S. National Library of Medicine, MedlinePlus, Dandy-Walker malformation, available at https://medlineplus.gov/genetics/condition/dandy-walker-malformation/; last visited on Oct. 28, 2021.
[4] Lehwald N, Krausch M, Franke C, Assmann B, Adam R, Knoefel WT. Sandifer syndrome--a multidisciplinary diagnostic and therapeutic challenge. Eur J Pediatr Surg. 2007 Jun;17(3):203-6. doi: 10.1055/s-2007-965145. PMID: 17638161. Available at Sandifer syndrome--a multidisciplinary diagnostic and therapeutic challenge - PubMed (nih.gov); last visited on Nov. 2, 2021.

41.    E.F. and Jessica moved from Michigan to Arizona in 2013 for a job opportunity. During this second year of E.F.'s life, he continued to have health issues, including convulsions, food intolerance, breathing issues, frequent infections and an undescended testicle.

42.    Upon moving to Arizona, Jessica selected E.F.'s primary care physician ("PCP") at Scottsdale Pediatric Center.

43.    E.F. underwent surgery for the undescended testicle, and was referred to a neurologist, immunologist and a gastroenterologist for his other symptoms. The neurologist started E.F. on anti-convulsing therapy.

### E.F.'s SECOND BIRTHDAY

44.    On November 26, 2013, E.F. turned two.

45.    During his third year of life (Nov. 2013 to Nov. 2014), E.F. continued to have health issues, including symptoms attributed to allergies, frequent infections, seizures, and convulsions.

46.    Upon referral by E.F.'s PCP, he was seen by PCH's immunologist for his frequent infections and allergy symptoms.

47.    E.F. also underwent diagnostic testing (blood work and EEG) for the seizures. The EEG showed "diffuse slowing" but no diagnosis was made. Blood work showed "mild microcytic anemia and iron studies revealed low iron saturation with low-normal ferritin." E.F. was started on oral iron therapy.

### E.F.'s THIRD BIRTHDAY

48.    On November 26, 2014, E.F. turned three.

49.    During his fourth year of life (Nov. 2014 to Nov. 2015), E.F. continued to have health issues, including chronic sinusitis and developmental delays.

50.    He had his second surgery of his life when his adenoids and tonsils were removed. He was also referred by his PCP to a Development Pediatrician who diagnosed E.F. with ADD and started him on guanfacine.

### E.F.'s FOURTH BIRTHDAY

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

51.     On November 26, 2015, E.F. turned four.

52.     In his fifth year of life (Nov. 2015 to Nov. 2016), E.F. was referred by his PCP to multiple specialists and was hospitalized several times for ongoing care related the following symptom: (1) bowel and urinary incontinence, (2) lack of awareness when he is soiled or wet, (3) chronic constipation, (4) diarrhea, (5) global developmental delays, (6) seizures, (7) encephalopathy consisting of ADHD, (8) communication disorder, (9) fine motor coordination disorder, (10) sensory processing difficulties, (11) frequent infections and (12) repeated episodes of dehydration which required hospitalization.

53.     A variety of tests were performed, but there was no definitive diagnosis. His blood work showed abnormalities which were decreased IgG and IgA antibodies.

54.     In March 2016, developmental testing showed: low-average early academic skills, including, below average vocabulary, receptive language, and visual-motor skills; and well-below-average expressive language skills.

55.     E.F. had several sweat tests to test for cystic fibrosis and those were abnormal.

56.     At this time, speculated diagnoses among the specialists included a *congenital disorder due* to a *chromosomal anomaly*, food allergies, an *undiagnosed cystic fibrosis*, transient hypogammaglobulinemia, mitochondrial disorder, and dysautonomia disorder or postural orthostatic tachycardia syndrome ("POTS").

57.     Treatments were initiated to address the symptoms but were not curative. These treatments were primarily the placement of a cecostomy tube (on May 4, 2016) and an intravenous ("IV") port (on August 26, 2016) to allow for IV administration of fluids and antibodies (IgG). These surgeries were performed at PCH.

58.     On September 12, 2016, E.F. was seen by a PCH cardiologist who advised that E.F. continue with the IV hydrations as there had been a marked improvement in his symptoms following these treatments.

59.     On October 7, 2016, E.F. was seen by a PCH developmental pediatrician, for a follow-up. The specialist noted "[s]ince the last visit, E.F. has received a cecostomy tube

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

and this has significantly helped his constipation. He also received a port and is getting fluids every other day. He is a changed kid - he is happier, sleeping more normally, interactive, interested and his learning has accelerated. Today, testing places him in the average range for early academics and language skills."

**E.F.'s Fifth Birthday**

60.    On November 26, 2016, E.F. turned five.

61.    During his sixth year of life (Nov. 2016 to Nov. 2017), E.F. continued to have problems related to encephalopathy consisting of ADHD, global developmental delays, communication disorder, fine motor coordination disorder, transient hypogammaglobulinemia and sensory processing difficulties.

62.    The cardiologist recommended continuing IV fluids but planned to decrease frequency as symptoms improve. E.F. had a home and school nurse to administer the IV fluids.

63.    Because an infection in a central line can be life-threatening, Jessica was instructed to take E.F. to the emergency room if E.F.'s temperature was 100.4 or higher.

64.    On January 01, 2017, E.F. was admitted to PCH for a fever and an issue in the central line, along with a viral respiratory infection.

65.    On January 18, 2017, upon referral by a PCH specialist, another PCH specialist consulted with Jessica regarding the possibility of removing the IV port and placing a different kind of port ("Broviac") for patient comfort. This was to address the concern that E.F. was requiring constant use of his IV port for IV fluid treatment, and it had become extremely difficulty to access due to repeated needle sticks and the associated pain.

66.    On February 03, 2017, in a follow-up visit with a PCH developmental pediatrician, the specialist noted that E.F. "continues to work with OT and speech twice weekly, which is still medically necessary" and that E.F. is "happy and has at least average intelligence. He still has a significant articulation disorder."

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

67.     On February 15, 2017 E.F.'s home nurse observed difficulty with the central line not flushing and getting a blood return. He attempted to increase the flow rate, but the line pressure raised too high, and the pump's alarm triggered.

68.     Jessica, the nurse, and E.F. then went to the emergency room at PCH.

69.     E.F. was observed over a number of hours. PCH personnel attempted, but failed to correct the faulty central line.

70.     Finally, he was admitted to so that a PCH physician could remove IV port and replace it with the Broviac.

71.     Following a March 2017 PCH admission, a PCH specialist, Jessica, and a PCH pediatrician, conferred. They decide, for continuity of care, it would be best to keep all of E.F.'s providers within the same facility and that the PCH pediatrician should take over as E.F.'s primary care physician.

72.     On March 2, 2017, E.F. was seen by a cardiac specialist for a follow-up visit. At this visit, the specialist noted that E.F. was stable post-Broviac placement, but he still suffered from breakthrough temperature instability and fatigue. He also noted that "he is a very complex case, especially in light of his age."

73.     Records also show that Jessica was looking for answers regarding her son's medical issues and was seeking another opinion.

74.     On March 4, 2017, a PCH specialist wrote a letter recommending that E.F. to go to Stanford University Hospital for a consult due to the dysautonomia/POTS diagnosis.

75.     On April 20, 2017, E.F. was seen by a PCH specialist for ongoing cardiac follow-up. Jessica and the home health nurse observed that E.F. was having random fevers, hives, and severe abdominal pain, plus fatigue.

76.     The cardiac specialist records show that he instructed Jessica as follows: "If he is hospitalized in the future, I have advised his Jessica to carry my notes with them and having the ER call my office before treating him."

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

77.    On April 26, 2017, another PCH doctor became E.F.'s primary care pediatrician ("PCP") to ensure continuity of care.

78.    On May 03, 2017, upon referral by a PCH doctor, E.F. met with a PCH Pediatric Gastroenterologist.

79.    On May 17, 2017, E.F. met with a cardiac specialist for a follow-up visit. Jessica reports being frustrated that E.F.'s condition fluctuated so drastically. The PCH doctor decided to continue the IV fluids and expressed support that Jessica and the nurse experiment with the fluids schedule to see what worked best. He also encouraged Jessica to bring E.F. for a consult with a specialist at Stanford University Hospital in California.

80.    On May 22, 2017, E.F. went to the PCH emergency room for a possible line infection. The culture showed a positive growth, indicating infection was present.

81.    In addition, E.F. presented with a whistling-like breathing sound. The record states that E.F. had been admitted several times to the hospital in the past months for extra fluids and that his symptoms change rapidly.

82.    On June 15, 2017, E.F. saw a PCH doctor for a follow-up. This doctor noted that E.F. was sleeping a lot, not feeling well, but the cultures negative and his temperature was low (95.8). He requested that the consulting doctor at Stanford give E.F. "an extensive work-up as he is not responding well to fluids and has been hospitalized 9 times in the past 3 months due to flare ups related to his dysautonomia."

83.    On June 20, 2017, E.F. saw a specialist at Stanford for a neurological consult. This specialist provided a long letter summarizing E.F.'s medical history to history to date as follows. E.F. had: (1) apnea spells as baby <1-year-old; (2) GI system quite affected; (3) frequent urination, the test showed slightly hyperactive bladder; (4) evaluated for cystic fibrosis, it was negative; (5) repeated imaging showed white matter disease consistent with mitochondrial dysfunction; (6) language delay; (7) sleep is affected (13-14 hours per day); (8) allergic to red dye #40, gets hives; (9) definite decrease to pinprick and pain stimuli upon exam; (10) abnormal sweat noted, but no test to diagnose why.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

84.     This specialist suspected E.F has "significant cholinergic deficit" and suggested a low-dose of pyridostigmine to see if helps his entire autonomic spectrum, including GI motility and sweat.

**III.**    **EVIDENCE THAT DR. CHRISTENSEN'S MOTIVATION TO CALL DCS IN 2020 WAS TO SETTLE A SCORE FROM A DISAGREEMENT HE HAD IN 2017 WITH JESSICA AND DISCORD WITH PCH SPECIALISTS, RATHER THAN TO PROTECT E.F. FROM HARM.**

85.     On June 29, 2017, Jessica brought E.F. for an office visit with a PCH doctor because he was not feeling well. This doctor recommended Jessica take E.F. to the hospital to try to figure out what was going on.

86.     At the hospital, E.F. was admitted to the 8th floor, which is the neurology floor. No IV fluids were administered, per Jessica's request.

87.     At this time, Jessica wanted to take the most conservative approach and get E.F. off of all medications and IV fluids.

88.     Jessica was concerned about the varying medical opinions she had been receiving and was, understandably, becoming increasingly frustrated.

89.     On the morning of June 30, E.F.'s blood pressure dropped, he looked pale, and he nearly fainted. After much discussion between the care takers, IV fluids were administered and E.F. improved. E.F. was then transferred to the 4th floor, where E.F. was normally admitted.

90.     On July 1, 2017, Defendant Dr. Christensen was on duty.

91.     At their very first meeting, Dr. Christensen strode into E.F.'s room, voice raised, and announced that after his extensive evaluation of E.F.'s medical records, he had determined that "there is nothing wrong with your child!"

92.     Furthermore, Dr. Christensen proclaimed that the cardiac specialist following E.F. would frequently prescribe unnecessary IV fluids.

93.     He also asked Jessica "who was the quack" who prescribed the IgG antibodies?  And, "what do you want from us?!"

94.     Dr. Christensen continued to scold Jessica, telling her she needed a care conference with all of E.F.'s providers. He also ignored her when she told him she had

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

15

been asking for a care conference, because she was frustrated and was seeking guidance on how to handle E.F.'s health issues and requesting coordination between all providers.

95.    Jessica asked if Dr. Christensen would take E.F. off all medications during this hospital admission to see if they can evaluate his symptoms without any medical interventions in a safe environment.

96.    He flatly refused this request.

97.    After this incident, Jessica questioned Dr. Christensen's ability to treat her child. She later informed PCH of her discomfort with Dr. Christensen and ultimately asked if he could be removed from treating her son during admissions.

98.    Dr. Christensen misrepresented the summary of this team meeting in E.F.'s medical records as follows: "[a]fter review of the patient's' extensive workup, the team has concern with 'over diagnosis' and 'over management' with multiple diagnoses that require substantiating." He recommended, in the record, that there be a "care conference with Pt's PCP and various subspecialists be organized to help determine appropriate manage in the future."

99.    On July 1, 2017, after Dr. Christensen failed to help Jessica explore options to lessen E.F.'s medical interventions, Jessica found herself further frustrated and without a clear plan for her son.

100.    E.F. continued to have medical problems. Jessica was searching for the most conservative medical care plan for her son and was continuously being bounced from specialist to specialist.

101.    As a concerned and loving mother, she was forced to follow the doctor's orders and recommendations.

**IV.    E.F'S PCP, IMMUNOLOGIST, GENETICIST AND CARDIOLOGIST DID NOT AGREE WITH DR. CHRISTENSEN.**

102.    On July 3, 2017, a PCH specialist saw E.F. for ongoing care. He instructed Jessica to give E.F. "an extra bolus of fluids when symptomatic."

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

16

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

103.    After reviewing the research within which Jessica found herself, the PCH specialist recommended taking E.F. off guanfacine (a medication used to treat ADHD) because it has been shown to cause POTS. Given E.F.'s possible POTS diagnosis, this made the most sense. However, the PCH specialist recommended that Jessica restart his other medications because his allergies were bothering him. In addition, the cardiac specialist directly contradicted Dr. Christiansen when he informed Jessica that he "highly advised restarting his IV fluids."

104.    Furthermore, the PCH specialist stated in his records: "If he is hospitalized in the future, I have advised Jessica to carry my notes with them and having the ER call my office before treating him."

105.    On July 3, 2017, E.F. was seen by a PCH Resident and a PCH Fellow, both of whom were associated with one of E.F.'s PCH specialist's office, noted that they had a "long discussion with mom today.., regarding her previous hospitalization and importance of seeing specialists with regards to specialty care going forward." Their summary states: "During most recent hospitalization, it was mentioned by multiple members of the hospitalist team that E.F. was being "over diagnosed and over treated" and that he was "on too many medications."

106.    The record also states that E.F. vomited twice prior to coming in that day and his heart rate was elevated.

**V.    PCH WAS PUT ON NOTICE THAT JESSICA WAS SEEKING HELP TO NORMALIZE E.F.'S LIFE AND WAS FRUSTRATED WITH THE CARE E.F. HAD BEEN RECEIVING.**

107.    On July 17, 2017, A PCH social worker noted Jessica's frustrations and ongoing concerns related to E.F.'s frequent hospitalizations. Jessica reported that she was particularly frustrated because no one on E.F.'s medical team was able to tell her what was wrong with her son. She asked for a plan in place for when E.F. developed a fever and if he has to be brought to the hospital or not. She was seeking guidance and not getting any consistent answers from PCH.

108.    Additionally, Jessica made clear that her only goal was for her son E.F. to "just be a kid'."

109.    Between August to October 2017, Jessica followed the PCH specialist's order to remove E.F. from the guanfacine prescription, given its correlation to POTS and other side effects. After stopping the guanfacine prescription, E.F. improved.

110.    Also during this timeframe, Jessica consulted with the specialist to see if the IV fluids could be stopped. The decision was made by PCH specialists that E.F. no longer needed daily IV fluids.

111.    However, IV access was still required for the frequent administration of IV antibodies (IgG), which did help E.F.'s symptoms.

### E.F.'s Sixth Birthday

112.    On November 26, 2017, E.F. turned 6, and his symptoms continued.

113.    On December 14, 2017, a PCH specialist noted that E.F. was going to Stanford Hospital on January 30, 2018 per PCH recommendations, which Jessica continued to follow.

114.    In this report, the PCH specialist stated that E.F. was generally stable but was continuing to have breakthrough temperature instability and excessive fatigue but that he was improving greatly. The PCH specialist recommended that E.F. continue IV fluid treatment. Per usual, Jessica followed the doctor's orders.

115.    In February 2018, a PCH specialist noted that the Stanford specialist recommended E.F. to see a geneticist to further address his medical issues. At this time, E.F. also continued to suffer from urination and defecation issues.

116.    The specialist also performed a sweat test on E.F. which indicated autonomic neuropathy.

117.    Jessica was frightened and confused by the numerous diagnoses and myriad doctors' orders with which she was trying to comply. As a single mother, Jessica was also very concerned about maintaining gainful employment to provide for her son and herself.

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

18

118.    On March 01, 2018, E.F. was taken off of IVIG infusions in accordance with PCH medical professionals' recommendations.

119.    Shortly thereafter, E.F. began having frequent infections. E.F. was severely fatigued and his temperature continued to be unstable. E.F. continued with IV fluid treatments at this time.

120.    E.F. also continued to suffer from GI issues. Jessica was again frightened and concerned for her son's medical conditions; yet, she continued to entrust and comply with PCH medical professionals' recommendations.

121.    In April 2018, a pediatric gastroenterologist at PCH referred Jessica and E.F. for a consultation with a specialist at Cincinnati Children's Hospital to address the GI issues. Jessica followed this medical advice.

122.    During this timeframe, another medical specialist also discussed with Jessica the benefits for E.F. to undergo formal testing for autism spectrum disorder. A PCH specialist referred Jessica and E.F. to another PCH specialist for diagnostic testing regarding this issue.

123.    During this timeframe, E.F. remained on IV fluid treatment, per the recommendation of a PCH specialist.

124.    In May 2018, E.F. continued to suffer from frequent infections, and Jessica was told by a PCH specialist to return for an immune workup in three (3) months.

125.    Also in May 2018, Jessica took E.F. to the PCH neurologist (as recommended by a PCH specialist) for formal testing for autism spectrum disorder.

126.    The PCH neurologist noted: "E.F. is a 6-year-old boy with a developmental encephalopathy with prominent speech articulation delay with multiple medical problems who has improved in cognitive and behavioral and social function with starting IVF. The etiology of his disorder remains elusive. In examination today he does not meet criteria for ASD per the ADOS or DSM-V criteria."

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

127.    The PCH neurologist recommended an EMG, Mito-Swab test, Mitochondrial DNA sequence analysis, and to consider skin biopsy and "continue IVF if they continue to help."

128.    During this timeframe, E.F. continued to suffer from GI issues and a weakened immune system

129.    In June 2018, E.F. developed a strep throat infection and was treated by a PCH pediatrician, who prescribed a seven (7) day round of antibiotics.

130.    In July 2018, E.F.'s port malfunctioned again, and it needed to be replaced. A PCH surgeon performed this procedure.

131.    Also in July 2018, E.F. experienced a seizure-like episode and behaved in a forgetful manner. In response to this, another PCH specialist recommended that E.F. continue with IV fluid treatment.

132.    Bloodwork was also conducted during this timeframe, and the blood chemistry report for E.F. indicated low IgG levels and possible primary immune deficiency.

133.    Additionally, during July 2018, E.F. was tested for undiagnosed metabolic disease and needed a PowerPort replacement.

134.    In August 2018, E.F. continued to experience infections and had been on multiple rounds of antibiotics. E.F. also continued to suffer from GI issues. Jessica continued to consult with medical professionals to address these issues.

135.    Her frustration and fear about her son's health continued to amass.

136.    In September 2018, E.F. suffered from difficulty with accessing his port, dehydration, and repeated fevers. As a result, his port was replaced.

137.    E.F. was also seen by a PCH specialist for issues related to mitochondrial disease, and he gave Jessica home care instructions (referred to as a "mito cocktail") to treat these issues.

138.    Again, Jessica followed the doctor's orders and also indicated that IV fluid treatments appeared to help E.F.'s symptoms.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

139.    In October 2018, E.F. suffered from another strep throat infection and was prescribed a three (3) week course of antibiotics. E.F.'s infections were increasing, and Jessica became progressively concerned about her son's health.

140.    E.F. also experienced low IgG results during this timeframe. Ultimately, Jessica complied with the doctor's orders, and E.F. completed the three (3) week course of antibiotics.

### E.F.'s Seventh Birthday

141.    On November 26, 2018, E.F. turned 7, and his medical issues remained unresolved.

142.    E.F. continued with treatment for mitochondrial dysfunction and developmental delay with a PCH specialist.

143.    In December 2018, E.F. continued to suffer from temperature instability and issues with urination and defecation. E.F.'s home health care nurse reported these issues to Jessica and the PCH specialists.

144.    In late December, Jessica returned to the Emergency Room (as she had been instructed to do by PCH doctors) because E.F. had another fever. E.F. was treated by PCH to resolve this issue.

145.    In January 2019, E.F.'s home health nurse and Jessica had a follow up visit with a PCH specialist who noted that E.F. had low antibodies. E.F. also had a follow up with another specialist who noted that E.F. was officially diagnosed with mitochondrial disease by a PCH specialist and that his symptoms improve while on IV hydration and IVIG infusion.

146.    Mitochondrial disease presents itself with a number of symptoms such as developmental delay or regression, language impairment, social impairment, intellectual disability, neuropsychiatric symptoms (e.g., ADHD, anxiety, OCD, depression), seizures, headaches, hearing impairment, weakness, small stature, fatigue, gastrointestinal symptoms, endocrine disturbance, and many others. (*See* Mitochondrial Dysfunction: Symptoms & Treatment | Cortica (corticacare.com), last visited on Sept. 3, 2021.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

147.    In February 2019, E.F. continued to experience temperature instability, which was documented by his home health nurse.

148.    In March 2019, E.F. had a new diagnosis of mitochondrial disorder and was experiencing symptoms of abdominal distention, vomiting, and was always hungry. The PCH medical team recommended the continuation of cecostomy flushes.

149.    Jessica was frustrated and did not know what to do next and that E.F.'s symptoms made no sense. She reached out to the Cincinnati medical doctor who recommended a bowel management program for E.F.

150.    In April 2019, E.F. continued to have GI issues. A PCH specialist recommended that E.F. remain on IV fluid treatment, and Jessica indicated she was instructed to take E.F. back to Cincinnati for their bowel management program.

151.    During this time period, E.F. was also experiencing issues at school. His special education coordinator reported that E.F. was very unfocused and needed redirection every two minutes.

152.    Jessica was understandably concerned about her son's health as well as his schooling and social development.

153.    In May 2019, the Cincinnati medical team cleared E.F. to complete the bowel management program that was recommended.

154.    E.F. also suffered from a line infection and required IV antibiotics during this time period.

155.    In June 2019, E.F. continued to suffer from medical and behavioral issues related to his medical issues.

156.    Specifically, an ileostomy was discussed as an option to take as E.F.'s quality of life was being severely impacted by his GI issues. They scheduled the ileostomy surgery.

157.    In July 2019, E.F. was hospitalized for abdominal pain. Again, the ileostomy option was discussed as well as the recommendation for E.F. to continue with IV fluid treatment.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

158.    Jessica was hesitant to move forward with a long term hospitalization because she did not want her son in the hospital for days and because her goal was always to keep E.F. out of the hospital and at home under the care of his home health nurse. She continued to follow the recommendations of the PCH specialists.

159.    In August 2019, PCH specialists referred E.F. to a Banner Children's Surgery Specialist for the ileostomy procedure. The reason for the recommendation to perform the ileostomy in Arizona (rather than in Cincinnati) is that the procedure would require post-operative visits.

160.    Prior to performing the ileostomy, the medical team at Banner Children's recommended a barium enema to evaluate E.F.'s colon, which was the more conservative route of medical treatment for E.F.'s issues. Based on those results, the Banner Children's medical team recommended a hemi-colectomy, not an ileostomy, in September 2019. This procedure was performed in October 2019.

161.    Later in October, E.F. was admitted to PCH for three (3) days with issues related to post-surgery abdominal pain and constipation. Prior to admission, Jessica asked if E.F.'s symptoms were related to the surgery so she could take E.F. to Banner where the surgery was performed.

162.    She was advised to stay at PCH but the treating physicians refused to call the Banner surgeon who performed the hemi-colectomy a few days prior. Jessica requested that they call him multiple times.

163.    Fluid intake and recurrent infections remained an issue for E.F. so he continued with fluid intake therapy based on the PCH doctors' recommendations.

### E.F.'S EIGHTH BIRTHDAY

164.    On November 26, 2019, E.F. turned 8, and he continued to struggle with medical problems.

165.    In December 2019, E.F. continued with the PCH prescribed IVIG treatments because it appeared that these treatments were beneficial to E.F. and reducing prolonged and frequent illnesses. Jessica complied with this treatment plan for her son.

166.    Additionally, medical specialists noticed a positive difference with E.F. when he was receiving IV treatments.

167.    In January 2020, E.F. was still receiving medical care related to frequent infections, dysautonomia, and mitochondrial symptoms. Jessica complied with the doctors' recommendations regarding this health issue with which E.F. was dealing.

168.    On January 29, 2020, Dr. Christensen reports Jessica to the Arizona Department of Child Services.

169.    PCH and DCS are parties to a contract whereby PCH medical professionals receive a monetary incentive as soon as they report a case to DCS.

170.    In February 2020, E.F. was experiencing increased breathing issues that had been occurring for approximately six (6) months. This was also around the time that the COVID-19 virus was detected in the United States. An x-ray showed interstitial pneumonitis.

171.    Jessica was advised by the treating physician to watch E.F. for symptoms such as difficulty to fill his lungs with air. Understandably, Jessica was extremely concerned about her son's respiratory issues.

172.    Also in February 2020, one of E.F.'s treating physicians emphasized the importance of IV fluids for E.F's medical treatment.

173.    In addition, in late February 2020, E.F. showed signs of tachycardia and underwent a 7-day Holter monitor. Due to the tachycardia shown, E.F. was given a beta-blocker from one of his medical team specialists. Jessica was very frightened.

174.    In February 2020, Dr. Christensen has a meeting with Dr. Coffman, Drue Kaplan-Siekmann, and members of DCS, the Maricopa County Attorney's Office and the Scottsdale Police Department. During this meeting, Dr. Christensen provided inaccurate medical information.

175.    In February of 2020 Ms. Kaplan-Siekmann, LMSW, of Kaplan-Siekmann Forensic Services, LLC, was retained by DCS to review E.F.'s medical records.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

176.    In March of 2020, E.F. was seen by a geneticist and an allergy/immunology doctor. The geneticist previously recommended a muscle biopsy and E.F. had the muscle biopsy which revealed elevated levels of several enzymes, which is likely indicative of mitochondrial dysfunction. The geneticist encouraged the continuation of E.F.'s medication and "mito cocktail."

177.    E.F. also had follow-up cardiac care. During this visit, E.F.'s fluid regime was decreased at the request of Jessica.

178.    Jessica was again informed to bring him to the emergency room if he appears sick.

179.    Finally, Jessica was again advised to carry the treating physician's notes with her and to have the emergency room call his office before treating E.F. if he is ever hospitalized.

180.    On March 19, 2020 Ms. Kaplan-Siekmann submitted her review of E.F.'s medical records to DCS. During this review Ms. Kaplan-Siekmann, made a finding of conscious deception or intentional conduct on behalf of Jessica, which are the hallmarks of Munchausen Syndrome by Proxy.

181.    Ms. Kaplan-Siekmann does not have a medical background, does not understand how to interpret medical documentation and findings, and was not provided with all of E.F.'s medical records including home health nursing notes.

182.    In addition, Ms. Kaplan-Siekmann lacked neutrality in her involvement in this case by solely collecting data that reflects a basis to support Drs. Christensen and Coffman, their relationship with DCS, and Ms. Kaplan Siekmann's relationship with DCS.

VI.    **DR. CHRISTENSEN IMPROPERLY INVOLVES DCS, AND DCS DOES NOT FOLLOW PROTOCOL.**

183.    On April 3, 2020, E.F. was removed from his home and subsequently admitted to PCH for suspected child abuse, in particular Munchausen Syndrome by Proxy and possible "doctor shopping."

184. E.F.'s admittance to PCH was based on Dr. Christensen's call to DCS, and Dr. Christensen was the admitting physician, who relied on inaccurate information and inaccurate medical history reports. He had only seen E.F. on one occasion in 2017.

185. DCS waited several days to remove E.F. from Jessica's home after requesting a temporary order for removal. Moreover, this removal did not occur until more than two months after Dr. Christensen's hotline call.

186. The day DCS removed E.F. from Jessica's home was the day Dr. Christensen was on duty at PCH.

187. At the very same time a DCS representative removed E.F. from Jessica's home, where E.F. and E.F.'s home health nurse were, and where Jessica should have been, Jessica was called to an in-person team decision meeting with DCS investigator Lisa Burns, OCWI supervisor Melinda Quigley, and DCS case manager Marisol Manjarrez.

188. At the same time E.F. was removed, DCS continued the meeting and did not allow Jessica to leave.

189. Melinda Quigley (Ms. Burns' direct supervisor during the relevant time period) provided authorization for Ms. Burns and Ms. Manjarrez to participate in the deceptive tactics to steer Jessica away from her home and remove her son without her presence. Ms. Manjarrez and Ms. Burns also consulted with Amber LaMonte, DCS psychologist, who ratified Ms. Manjarrez's and Ms. Burns' improper conduct. Michael Faust, Director of DCS, ratified all of Ms. Manjarrez's and Ms. Burns' improper conduct.

190. On March 30, DCS filed a report to the juvenile court for a preliminary protective hearing and/or initial dependency hearing.

191. On April 8, 2020, Jessica received the dependency petition and the DCS report and attachments dated April 6, 2020.

192. On April 8, 2020, the court found that E.F. should not be placed with Jessica based on the petition and DCS report.

193. On April 11, 2020, Jessica received correspondence from DCS informing her that E.F. would be placed in a foster home that is not of the Jewish faith.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

194.    On April 15, 2020, Jessica again provided the names of relatives (including her mother) who could take care of E.F. Jessica also provided the names of licensed foster/child development caregivers who are of the Jewish faith. DCS ignored all of Jessica's recommendations and proceeded to ignore its obligation to place E.F. in the least restrictive environment.

195.    On April 16, 2020, Dr. Coffman was asked to follow the case at the request of Dr. Christensen due to possible medical abuse. Dr. Coffman did not conduct her own review of E.F.'s medical records and inaccurately summarized his medical history in her letter recommending medical care for the child to DCS.

196.    In accordance with a contract with DCS, Dr. Coffman received $103,738 in 2019 from DCS as a physician consultant. Mr. Faust ratified this payment to Dr. Coffman.

197.    Jessica received an email from DCS on April 30, 2020 that E.F.'s investigative case was closed.

198.    In May 2020, Ms. Manjarrez indicated to Jessica that E.F. did not love her and that she should be happy that he did anything for her for Mother's Day.

199.    Kimmesha Edwards and Francisco Sanez directly supervised Ms. Manjarrez during her work with E.F. and ratified her unprofessional and incompetent conduct. Bryan Adams supervised Ms. Edwards and Mr. Sanez, and as a result, ratified their unprofessional and incompetent conduct.

200.    On May 27, 2020 Jessica received a case plan of severance and adoption. It was explained to Jessica the process DCS will take to sever her rights and find a permanent home for E.F.

201.    On August 19, 20 and September 14, 2020 an evidentiary hearing was conducted.

202.    Further false information, which DCS relied on that was provided by Drs. Coffman and Christensen, was that in October 2019, Jessica took E.F. to Banner to have an unnecessary bowel surgery performed. . This is false. PCH doctors referred E.F. to Banner for evaluation. E.F. had a barium swallow which was ordered by his treating

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

27

doctor at Banner and the test revealed that E.F. had a redundant colon. The medical professional at Banner performed the hemi-colectomy which removed the redundant colon..

203. Lisa Burns from DCS also failed to investigate E.F.'s matter with his primary care physician or any member of E.F.'s medical team. Ms. Burns claims she asked for medical records but admits that she is not a medical specialist and did not review these records. Instead, Ms. Burns relied upon Dr. Christensen's opinion of E.F.'s medical issues. Melinda Quigley from DCS, and supervisor of Ms. Burns, failed to review the facts in the case and ensure Ms. Burns was following DCS procedure. Ms. LaMonte consulted with Ms. Burns during this time period and ratified Ms. Burns' improper actions.

204. Ms. Burns further admitted that she did not know why Dr. Christensen only saw E.F. on one occasion and that other members of E.F.'s medical team were not aligned on Dr. Christensen's conclusion that E.F. was subjected to over-medicalization by Jessica.

205. During the evidentiary hearing, Dr. Christensen admitted that he did not review all of E.F.'s medical files before contacting DCS and jumping to the conclusion that E.F. was being over-medicalized.

206. Dr. Christensen also falsely represented the findings from E.F.'s Cincinnati medical team regarding the team's recommendation for an ileostomy, aa procedure which E.F. never underwent because Jessica sought the most conservative medical route his doctors recommended.

207. Dr. Christensen has had disagreements with specialists regarding IV treatments. Dr. Christensen also disagreed with PCH specialists over the issues of "over-diagnosis and over-treatments" of patients like E.F. Dr. Christensen never shared these disagreements with his colleagues, medical specialists, with DCS. He went so far as to call his colleague a "quack" for prescribing IVIG treatments to E.F., which were proving to be effective in treating E.F.'s symptoms.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

**VII.    DCS FAILED TO PLACE E.F. IN THE LEAST RESTRICTIVE HOME.**

208.    E.F. was placed in the foster home of Jason and Leigh Ann Treguboff (collectively, "the Treguboffs"). The Treguboffs are not members of the Jewish faith. E.F. was placed with the Treguboffs from April 17, 2020 – November 3, 2020.

209.    During all relevant times, The Treguboffs refused to allow E.F. to attend religious services for the Jewish holidays.

210.    During all relevant times, the Treguboffs refused to allow a Rabbi to see E.F. to conduct religious rituals and customs.

211.    While in  the Treguboffs' care, they refused to allow E.F. to eat a Kosher diet.

212.    Mrs. Treguboff frequently told E.F. that he must eat pork products and that he must combine meat and dairy products together. These dietary practices are forbidden by Jessica and E.F.'s  Jewish faith.

213.    The Treguboffs failed to comply with the visitation plan and E.F. was not made available or missed visitations without notice.

214.    The Treguboffs have five children and serve as a licensed foster development family.

215.    While under the Treguboffs' care, E.F. experienced extreme bullying by the Treguboffs' children. E.F. was called names and shamed for his urinary and defecation issues.

216.    The Treguboff children s would frequently block E.F.'s ability to get to the bathroom to clean up if he had an accident.

217.    On multiple occasions, E.F. was told that he was "gay" and was constantly called names such as "dumb bitch" by the other children in the home.

218.    E.F. has always known that when there is a conflict, he should seek out the assistance of an adult as the adult is there to help and protect him. However, due to Mrs. Treguboff's frequent berating of E.F., he did not feel comfortable talking to or approaching her.

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

219.    Mrs. Treguboff told E.F., her children, her friends and others in the community that E.F. was only in foster care because his mother was dangerous, and that Jessica was only allowed supervised visits because she was so dangerous. Mrs. Treguboff also implied that Jessica had some substance abuse issues.

220.    Mrs. Treguboff had insensitive and inappropriate conversations about E.F.'s situation and explained, in front of E.F., that the plan was for his mother's parental rights to be severed and she was dangerous.

221.    The Treguboffs provided false and inaccurate information and withheld pertinent information from E.F.'s medical team, DCS, and those involved in his care. The Treguboffs did this to ensure E.F. received additional services that were not needed, required or appropriate.

222.    The Treguboffs endorsed the push for an autism diagnosis even after a PCH specialist explained to them in May 2020 that E.F. did not have Autism. Still, the Treguboff's demanded additional evaluations and/or an Autism diagnosis from the PCH specialist and providers at Touchstone Behavioral Health.

223.    In E.F.'s psychiatric evaluation on or about June 4, 2020, Mrs. Treguboff falsely reported that E.F. was not capable to cutting his own food or showering independently.

224.    Mrs. Treguboff falsely reported to E.F.'s Occupational Therapist that he did not know how to wipe himself.

225.    Mrs. Treguboff claimed E.F. could not write for himself. Mrs. Treguboff would write for E.F. in the journal that Jessica and E.F. shared on how the week went during their visits, and would complete many of his homework assignments for school.

226.    Mrs. Treguboff's reports of E.F.'s lack of abilities was alarming to all that know him. Jessica was very concerned that E.F.'s skills were regressing.

227.    The Treguboffs described E.F. as not having any social skills. This assertion could not be further from the truth. On E.F.'s grading period 2 report card of the 2021-2022 school year, his teacher reported that "Eliron is one of the kindest student[s] I might

30

have ever had. He is always one of the first students to come up and ask any teacher how their day was or weekend. He even lets every teacher (really anyone he works with) [know] how much he appreciates them… [t]o say I enjoy working with him is an understatement."

228.    The Treguboffs did not follow medical advice.

229.    Jessica provided E.F. with his glasses shortly after his removal via a DCS employee and explained both verbally and through email why E.F. wore glasses.

230.    Medical records from PCH that was provided to the Treguboffs on April 17, 2020 indicated E.F. must wear glasses.

231.    Mrs. Treguboff unilaterally decided that E.F. did not need glasses.

232.    Despite Mrs. Treguboff making excuses as to why E.F. could not have an eye exam, she finally took E.F. to Nationwide Vision in Litchfield Park on or about October 30, 2020 and it was determined that E.F. needed a higher prescription- doubling his original prescription.

233.    Mrs. Treguboff failed to place an order for E.F. to receive glasses to match his current prescription.

234.    Mrs. Treguboff failed to discipline in a manner that is appropriate to the child's level of maturity by using the denial of food as a punishment.

235.    Mrs. Treguboff failed to allow E.F. to have his personal belongings such as clothing (e.g. basketball shorts, plain t-shirts) and did not return property that belonged to E.F. when he returned home.

236.    At all relevant times, DCS employees were informed of the above allegations regarding the Treguboffs.

237.    After seven (7) months, E.F. was finally reunited with his mother. The juvenile court dismissed the case at the request of the Department.

238.    Jessica continues to monitor E.F.'s health and supports her son. Jessica understandably experienced severe trauma as a result of DCS' improper removal of her son from her.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

239.    Mr. Faust allowed this improper conduct to occur.

**CLAIM ONE:**

**(Under 42 U.S.C. § 1983, Defendants Dr. Christensen, Dr. Coffman, Ms. Burns, Ms. Quigley, Ms. Manjarrez, Ms. Edwards, Mr. Sanez, Mr. Adams, Ms. LaMonte, Ms. Kaplan-Siekmann, Mr. Faust are liable for violating Plaintiffs right to Freedom of Association under the First Amendment and Due Process under the Fourteenth Amendment to the U.S. Constitution for unlawfully seizing E.F.)**

240.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the paragraphs above.

241.    On or about April 3, 2020, E.F. was removed from his home by DCS.

242.    DCS seized E.F. based on false information provided by Dr. Christensen and Dr. Coffman and with improper recommendations from Ms. Burns, Ms. Quigley, Ms. Manjarrez, Ms. Edwards, Mr. Sanez, Ms. LaMonte, Ms. Kaplan-Siekman, and with the ratification of Mr. Faust and DCS.

243.    Dr. Christensen, Dr. Coffman, Ms. Burns, Ms. Quigley, Ms. Manjarrez, Mr. Sanez, Ms. Edwards, Mr. Adams, Ms. LaMonte, Ms. Kaplan-Siekman and Mr. Faust substantially participated in the seizure of E.F.

244.    At the time Dr. Christensen, Dr. Coffman, Ms. Burns, Ms. Quigley, Ms. Manjarrez, Mr. Sanez, Ms. Edwards, Mr. Adams, Ms. LaMonte, Ms. Kaplan-Siekmann and Mr. Faust substantially participated in the seizure of E.F., it was well established that the Fourteenth Amendment protects the rights of parents and children to live together without government interference. *Wallis v. Spencer*, 202 F.3d 1126, 1136 (9th Cir. 2000).

245.    At the time Dr. Christensen, Dr. Coffman, Ms. Burns, Ms. Quigley, Ms. Manjarrez, Mr. Sanez, Mr. Edwards, Ms. LaMonte, Ms. Kaplan-Siekman, Mr. Adams, and Mr. Faust substantially participated in the seizure of E.F., it was well established that the First Amendment also protects "family relationships, that presuppose 'deep attachments and commitments to the necessarily few other individuals with whom one shares not

only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life." *Lee v. City of Los Angeles*, 250 F. 3d 668, 685 (9th Cir. 2001).

246.    At the time Dr. Christensen, Dr. Coffman, Ms. Burns, Ms. Quigley, Ms. Manjarrez, Mr. Sanez, Mr. Edwards, Ms. LaMonte, Ms. Kaplan-Siekman, Mr. Adams, and Mr. Faust substantially participated in the seizure of E.F., it was well established that a state official "cannot seize children suspected of being abused or neglected unless reasonable avenues of investigation are first pursued," the "scope of the intrusion" must be "reasonably necessary to avert" a specific injury, and the intrusion cannot be longer than necessary to avert the injury. *Wallis*, 202 F.3d at 1138-1141.

247.    At the time Dr. Christensen, Dr. Coffman, Ms. Burns, Ms. Quigley, Ms. Manjarrez, Mr. Sanez, Mr. Edwards, Mr. Adams, Ms. LaMonte, Ms. Kaplan-Siekman, and Mr. Faust substantially participated in the seizure of E.F., they did not have information that established reasonable cause to believe that E.F. was in imminent danger of serious bodily injury.

248.    Prior to seizing E.F., Dr. Christensen, Dr. Coffman, Ms. Burns, Ms. Quigley, Ms. Manjarrez, Mr. Sanez, Mr. Edwards, Mr. Adams, Ms. LaMonte, Ms. Kaplan-Siekman, and Mr. Faust did not first pursue reasonable avenues of investigation.

249.    When Dr. Christensen, Dr. Coffman, Ms. Burns, Ms. Quigley, Ms. Manjarrez, Mr. Sanez, Mr. Edwards, Mr. Adams, Ms. LaMonte, Ms. Kaplan-Siekman, and Mr. Faust substantially participated in the seizure of E.F., the scope of the intrusion was not reasonably necessary to avert any specific injury, and, even if it were, the intrusion was longer than necessary to avert the injury.

250.    At the time Dr. Christensen, Dr. Coffman, Ms. Burns, Ms. Quigley, Ms. Manjarrez, Mr. Sanez, Mr. Edwards, Mr. Adams, Ms. LaMonte, Ms. Kaplan-Siekman and Mr. Faust substantially participated in the seizure of E.F., there were no exigent circumstances that justified the seizure.

251.    At the time Dr. Christensen, Dr. Coffman, Ms. Burns, Ms. Quigley, Ms. Manjarrez, Mr. Sanez, Mr. Edwards, Mr. Adams, Ms. LaMonte, Ms. Kaplan-Siekman and

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

Mr. Faust substantially participated in the seizure of E.F., no reasonable person in their position would have believed that E.F. would be harmed, and they clearly did not think he would as it took them three (3) days after obtaining a court order to seize E.F.

252.    At the time Dr. Christensen, Dr. Coffman, Ms. Burns, Ms. Quigley, Ms. Manjarrez, Mr. Sanez, Mr. Edwards, Mr. Adams, Ms. LaMonte, Ms. Kaplan-Siekman and Mr. Faust substantially participated in the seizure of E.F., each of them, acted under the color of law when they seized E.F.

253.    Dr. Christensen, Dr. Coffman, Ms. Burns, Ms. Quigley, Ms. Manjarrez, Mr. Sanez, Mr. Edwards, Mr. Adams, Ms. LaMonte, Ms. Kaplan-Siekman and Mr. Faust substantially participation in the seizure of E.F., violated Plaintiffs' constitutional rights.

254.    As a direct and proximate result of the violation of Plaintiffs' constitutional rights, Plaintiffs suffered irreparable harm and will continue to suffer general and special damages, in an amount not yet ascertained but which shall be shown according to proof at trial.

**CLAIM TWO:**
**(Under 42 U.S.C. § 1983, Defendants Dr. Christensen, Dr. Coffman, and Ms. Kaplan-Siekmann are liable for violating Plaintiffs right to Due Process under the Fourth and Fourteenth Amendments for making misrepresentations and/or omissions to the court which were deliberate falsehoods and/or which demonstrated a reckless disregard for the truth.)**

255.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the paragraphs above.

256.    It is well established that liability for a § 1983 claim will lie for judicial deception. *Liston v. County of Riverside*, 120 F.3d 965, 972 (9th Cir. 1997).

257.    Although, the Ninth Circuit has "recognized absolute immunity for social workers ... for the discretionary, quasi-prosecutorial decisions to institute court dependency proceedings to take custody away from parents," the "scope of absolute immunity for social workers is extremely narrow." *Miller v. Gammie*, 335 F.3d 889, 989

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

(9th Cir. 2003). Absolute immunity does not extend to the fabrication of false evidence or perjury. *Hardwick v. County of Orange,* 844 F. 3d 1112 (9th Cir. 2017).

258.    At all relevant times, "the constitutional right to be free from the knowing presentation of false or perjured evidence" was clearly established. *Hardwick v. County of Orange*, 844 F. 3d 1112 (9th Cir. 2017); *see also Devereaux v. Perez*, 218 F.3d 1045 (9th Cir.2000); *Whitaker v. Garcetti*, 486 F.3d 572, 582 (2007) (concluding that "the contours of the Fourth Amendment right against judicial deception" were clearly established by 1996).

259.    During his testimony under oath, Dr. Christensen made statements which were false and/or demonstrated a reckless disregard for the truth, including, but not limited to the false testimony.

260.    Throughout the case, Dr. Christensen falsely represented that Jessica subjected E.F. to a surgical procedure that was never performed and misrepresented E.F.'s medical history.

261.    Dr. Coffman supported Dr. Christensen's falsehoods and inaccurately summarized E.F.'s medical history.

262.    On March 19, 2020 Ms. Kaplan-Siekmann submitted her review of E.F.'s medical file to DCS. During this review Ms. Kaplan-Siekmann, made a finding of conscious deception or intentional conduct on behalf of Jessica, which are the hallmarks of Munchausen Syndrome by Proxy.

263.    Ms. Kaplan-Siekmann does not have a medical background, does not understand how to interpret medical documentation and findings, and was not provided with all of E.F.'s medical records including home health nursing notes.

264.    In addition, Ms. Kaplan-Siekmann lacked neutrality in her involvement in this case by solely collecting data that reflects a basis to support Drs. Christensen and Coffman, their relationship with DCS, and Ms. Kaplan Siekmann's relationship with DCS.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

265.    When committing these acts of judicial deception, Ms. Kaplan-Siekmann, Dr. Christensen, and Dr. Coffman were acting under color of law.

266.    As a direct and proximate result of the violations of Plaintiffs' constitutional rights, Plaintiffs suffered irreparable harm and will continue to suffer general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

### CLAIM THREE:

**(Under 42 U.S.C. § 1983, Defendants Drs. Christensen and Coffman are liable for conspiring to violate Plaintiffs right to Due Process under the Fourth and Fourteenth Amendments to be free from misrepresentations and/or omissions to the court which were deliberate falsehoods and/or which demonstrated a reckless disregard for the truth.)**

267.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the paragraphs above.

268.    At all relevant times, it was well established that liability for a conspiracy in a § 1983 case will lie when there exists an "agreement or meeting of the minds" to violate constitutional rights. *Crowe v. Cty. of San Diego*, 608 F.3d 406, 440 (9th Cir. 2010). Such an agreement need not be overt, and may be inferred on the basis of circumstantial evidence such as the actions of the defendants." *Id.*

269.    At all relevant times, it was also well established: "A private individual may be liable under § 1983 if she conspired or entered joint action with a state actor." *Franklin v. Fox*, 312 F.3d 423, 441 (9th Cir.2002).

270.    Drs. Christensen and Coffman conspired to deceive the court by failing to thoroughly review E.F.'s medical history records and providing medical opinions which were based on false, biased, and/or misleading information and which did not contain a true and accurate report of E.F.s actual medical history.

271.    Drs. Christensen and Coffman conspired to violate Jessica's right to Due Process under the Fourth and Fourteenth Amendments to be free from misrepresentations and/or omissions to the court which were deliberate falsehoods

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

and/or which demonstrated a reckless disregard for the truth by conspiring to misrepresent E.F.'s medical history.

272.    When conspiring to violate Plaintiffs' right to Due Process under the Fourth and Fourteenth Amendments to be free from misrepresentations and/or omissions to the court which were deliberate falsehoods and/or which demonstrated a reckless disregard for the truth, Drs. Christensen and Coffman, and each of them, were acting under the color of law.

273.    As a direct and proximate result of the violations of Plaintiffs' constitutional rights, Plaintiffs suffered irreparable harm and will continue to suffer general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

**CLAIM FOUR:**

**(Under 42 U.S.C. § 1983, Defendants Ms. Quigley, Ms. Burns, Ms. Manjarrez, Ms. Edwards, Mr. Sanez, Mr. Adams, Ms. LaMonte and Mr. Faust are liable for violating Plaintiffs right to Due Process under the Fourth and Fourteenth Amendments for failing to make reasonable efforts to preserve the family relationship.)**

274.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the paragraphs above.

275.    At all relevant times, it was "well established that the State…has an affirmative duty to make all reasonable efforts to preserve the family relationship." *Mary Ellen C. v. Arizona Dep't of Econ. Sec.*, 193 Ariz. 185, 186, ¶ 1 (App. 1999). This duty is "defined [] on constitutional grounds." *Id*. at 192, ¶32. A "reasonable effort" requires the State "to undertake measures with a reasonable prospect of success." *Id*.

276.    At all relevant times, it was well established that DCS agents are "obligated to undertake measures with a reasonable probability of success." *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 192, ¶ 34 (App. 1999). DCS agents "must provide a parent with the time and opportunity to participate in programs designed to improve the parent's ability to care for the child." *Id*. at ¶ 37.

277.    At all relevant times, it was well established that "DCS has a constitutional obligation to attempt to unite" a parent with her children. *Donald W. v. Dep't of Child Safety*, 247 Ariz. 9, 24 ¶ 46 (App. 2019). "DCS is obliged to work with the parent toward a shared goal of reunification throughout the statutory period." *Id*. at 23, ¶ 49. At the "very least," reasonable efforts require "DCS to identify the conditions causing the child's out-of-home placement, provide services that have a reasonable prospect of success to remedy the circumstances as they arise throughout the time-in-care period, maintain consistent contact with the parent, and make reasonable efforts to assist the parent in areas where compliance proves difficult." *Id*. at 20, ¶ 50.

278.    At all relevant times, it was well-established that in determining whether DCS has complied with the law and made reasonable efforts to reunite a parent with their children, a juvenile court must view the "totality of the circumstances" and review DCS' actions during the entirety of time the child has been in DCS' care. *Donald W.*, 247 Ariz. at 19, ¶ 49.

279.    Ms. Quigley, Ms. Burns, Ms. Manjarrez, Mr. Edwards, Mr. Sanez, Mr. Adams, Ms. LaMonte and Mr. Faust violated Jessica's right to the State's reasonable efforts to reunite them by failing to complete a thorough investigation, as required by A.R.S. § 8-456(C)(1) and by relying on false information provided by Drs. Christensen and Coffman.

280.    Arizona law, specifically A.R.S. § 514(B), requires that DCS "place a child in the least restrictive type of placement available, consistent with the best interest of the child."

281.    Arizona law, specifically A.R.S. § 514(B), mandates that placement of a child in a kinship care with a member of the child's family is a less restrictive placement than placement with a foster family.

282.    Ms. Quigley, Ms. Burns, Ms. Manjarrez, Mr. Edwards, Mr. Sanez, Mr. Adams, Ms. LaMonte, and Mr. Faust violated Jessica's right to the State's reasonable

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

efforts to reunite her with her child by failing to keep E.F. with Jamie, E.F.'s maternal grandmother, as Jessica requested.

283.    Ms. Quigley, Ms. Burns, Ms. Manjarrez, Mr. Edwards, Mr. Adams, Mr. Sanez, Ms. LaMonte, and Mr. Faust violated Jessica's right to the State's reasonable efforts to reunite Jessica with her child by failing to place E.F. in a home practicing the Jewish faith after Jessica provided several licensed foster families of the Jewish faith.

284.    Ms. Manjarrez, Mr. Edwards, Mr. Sanez, Mr. Adams, Ms. LaMonte and Mr. Faust violated Jessica's right to the State's reasonable efforts to reunite Jessica with her child by limiting E.F.'s visits with his mother to two hours twice per week and not allowing Jessica to attend E.F.'s medical appointments while he was in foster care.

285.    When they violated Plaintiffs' right to the State's reasonable efforts to reunite them, DCS and Faust were acting under color of law.

286.    As a direct and proximate result of the violations of Plaintiffs' constitutional rights, Plaintiffs suffered irreparable harm and will continue to suffer general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

**CLAIM FIVE:**

**(Under 42 U.S.C. § 1983, Defendants Ms. Quigley, Ms. Burns, Ms. Manjarrez, Ms. Edwards, Mr. Sanez, Mr. Adams, Ms. LaMonte, Mr. Faust, and the Treguboffs are liable for violating Plaintiffs right to Freedom of Religion, under the First Amendment as incorporated by the Fourteenth Amendment to the U.S. Constitution, by placing E.F. with the Treguboffs who refused to permit E.F. to practice his Jewish faith.)**

287.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the paragraphs above.

288.    Defendants Ms. Quigley, Ms. Burns, Ms. Manjarrez, Mr. Edwards, Mr. Adams, Mr. Sanez, Ms. LaMonte, and Mr. Faust violated Plaintiffs' right to Freedom of Religion, under the First Amendment as incorporated by the Fourteenth Amendment to the U.S. Constitution by placing E.F. with the Treguboffs who refused to permit E.F. to

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

practice his level of observance of the Jewish faith, which requires certain dietary and other practices and observances.

289.    E.F. was placed in the foster home of the Treguboffs, who are not members of the Jewish faith, from April 17, 2020 – November 3, 2020.

290.    During all relevant times, The Treguboffs refused to allow E.F. to attend religious services for the Jewish holidays.

291.    During all relevant times, the Treguboffs refused to allow a Jewish Rabbi to see E.F. to conduct religious rituals and customs.

292.    While in  the Treguboffs' care, they refused to allow E.F. to eat a Kosher diet.

293.    Mrs. Treguboff frequently told E.F. that he must eat pork products and that he must combine meat and dairy products together. These dietary practices are forbidden by Jessica and E.F.'s Jewish faith.

294.    DCS Defendants Ms. Quigley, Ms. Burns, Ms. Manjarrez, Ms. Edwards, Mr. Sanez, Mr. Adams, Ms. LaMonte, Mr. Faust failed to ensure that E.F. was allowed to practice his Jewish while in placement.

295.    When they violated Plaintiffs' constitutional right to Freedom of Religion under the First Amendment, as incorporated by the Due Process Clause of the Fourteenth Amendment, Defendants Ms. Quigley, Ms. Burns, Ms. Manjarrez, Ms. Edwards, Mr. Sanez, Mr. Adams, Ms. LaMonte, Mr. Faust, the Treguboffs and each of them, were acting under color of law.

296.    As a direct and proximate result of the violations of Plaintiffs' constitutional rights, Plaintiffs suffered irreparable harm and will continue to suffer general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

**CLAIM SIX:**

**(Under 42 U.S.C. § 1983, Defendants Ms. Quigley, Ms. Burns, Ms. Manjarrez, Mr. Edwards, Mr. Sanez, Mr. Adams, Ms. LaMonte and Faust are liable to Plaintiffs for violating Jessica's Due Process under the**

**Fourteenth Amendment to the U.S. Constitution to make medical decisions for E.F.)**

297.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the paragraphs above.

298.    At all relevant times, it was well established that the constitutional due process "right to family association includes the right of parents to make important medical decisions for their children, and of children to have those decisions made by their parents rather than the state." *Wallis*, 202 F.3d at 1141 (citing *Parham v. J.R.*, 442 U.S. 584, 602 (1979) (holding that it is in the interest of both parents and children that parents have ultimate authority to make medical decisions for their children unless a "neutral fact finder" determines, through due process hearing, that parent is not acting in child's best interests)).

299.    At all relevant times, it was well established that: "All parental rights are reserved to a parent of a minor child without obstruction or interference from this state, any political subdivision of this state, any other governmental entity or any other institution, including: The right to make health care decisions for the minor child, including rights pursuant to §§ 15-873, 36-2271 and 36-2272, unless otherwise prohibited by law." A.R.S. § 1-602(A)(5).

300.    At all relevant times, it was well established that until there is a finding of dependency by a court, which legally entitles DCS "to temporarily invade" a parent's rights to "legal custody" of their child, that the state has no legal right to invade the constitutional and legal rights of a parent to make medical decisions for their child. *Diana H. v. Rubin*, 217 Ariz. 131, 134 ¶ 13 (2007).

301.    At all relevant times, it was well established that "the requirement that [the state child welfare organization] provide parental notice and obtain consent" before a child in its care and/or custody is provided medical treatment is not "inconsistent with [the state child welfare organization's] obligation to provide routine or emergency

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

medical care to children in its custody." *Mann v. Cty. of San Diego*, 907 F.3d 1154, 1163 (9th Cir. 2018).

302.    Defendants Ms. Quigley, Ms. Burns, Ms. Manjarrez, Mr. Edwards, Mr. Sanez, Mr. Adams, Ms. LaMonte and Mr. Faust interfered with Jessica's constitutional right to make medical decisions for her son by disallowing her from attending medical appointments while he was in foster care.

303.    When they violated Jessica's right to the State's reasonable efforts to reunite them, Defendants Ms. Quigley, Ms. Burns, Ms. Manjarrez, Mr. Edwards, Mr. Sanez, Mr. Adams, and Mr. Faust, and each of them, were acting under color of law.

304.    As a direct and proximate result of the violations of Jessica's constitutional rights, Plaintiffs suffered irreparable harm and will continue to suffer general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

**CLAIM SEVEN:**
**(Under 42 U.S.C. § 1983, Defendants Ms. Quigley, Ms. Burns, Ms. Manjarrez, Mr. Edwards, Mr. Sanez, Mr. Adams, Ms. Lamonte and Faust are liable to Plaintiffs for violating Jessica's Due Process right under the Fourteenth Amendment to the U.S. Constitution to be with E.F. during medical treatment.)**

305.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the paragraphs above.

306.    At all relevant times, it was well established that the "Constitution assures parents that, in the absence of parental consent, [medical treatment] of their child may not be undertaken … at the behest of state officials unless a judicial officer has determined, upon notice to the parents, and an opportunity to be heard, that grounds for such an [treatment] exist and that the administration of the procedure is reasonable under all the circumstances." Wallis, 202 F.3d at 1141 (9th Cir. 2000). "Moreover, parents have a right arising from the liberty interest in family association to be with their children while they are receiving medical attention (or to be in a waiting room or other nearby area if

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

there is a valid reason for excluding them while all or a part of the medical procedure is being conducted)." *Id.*

307.    Defendants Ms. Quigley, Ms. Burns, Ms. Manjarrez, Mr. Edwards, Mr. Sanez, Mr. Adams, Ms. LaMonte, and Mr. Faust interfered with Jessica's constitutional right to be present during E.F.'s medical appointments when he was in foster care.

308.    When they violated Jessica's right to be with E.F. during medical treatments, Defendants Ms. Quigley, Ms. Burns, Ms. Manjarrez, Mr. Edwards, Mr. Sanez, Mr. Adams, Ms. LaMonte, and Mr. Faust, and each of them, were acting under color of law.

309.    As a direct and proximate result of the violations of Plaintiffs' constitutional rights, Plaintiffs suffered irreparable harm and will continue to suffer general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

**CLAIM EIGHT:**
**(Under established Arizona law, Defendant Drs. Coffman and Christensen are liable to Plaintiffs for failing to provide the minimum accepted standard of care while rendering medical services to E.F.)**

310.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the paragraphs above.

311.    Drs. Coffman and Christensen had a duty to provide the minimum accepted standard of care while rendering medical services to E.F.

312.    As discussed above, Dr. Christensen breached his duty and failed to provide the minimum accepted standard of care while rendering medical services to E.F. Dr. Christensen falsely reported that E.F. had a surgical procedure. Dr. Christensen disregarded the medical opinions of his colleagues regarding E.F.'s medical condition. Dr. Christensen admitted that he did not review all of E.F.'s medical records before contacting DCS. Dr. Christensen falsely represented medical findings from E.F.'s Cincinnati medical team.

MILLS + WOODS LAW PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

313.    As discussed above, Dr. Coffman breached her duty and failed to provide the minimum accepted standard of care while rendering medical services to E.F. by not conducting her own review of E.F.'s medical records and by inaccurately summarizing his medical history to DCS.

314.    As a direct and proximate result of Drs. Coffman and Christensen failure to satisfy the minimum accepted standard of care while rendering medical services, Plaintiffs' suffered irreparable harm and will continue to suffer general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

### CLAIM NINE:

**(Under established Arizona law, Defendants Drs. Christensen and Coffman, Ms. Kaplan-Siekmann, Ms. Burns, Ms. Quigley, Ms. Manjarrez, Mr. Sanez, Mr. Adams, Ms. LaMonte, Mr. Faust are liable to Plaintiffs for exercising Gross Negligence in carrying out their duty to protect the legal rights of children and families.)**

315.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the paragraphs above.

316.    Under A.R.S. § 8-802 (D)(1), "[a]ll child safety workers shall be trained and demonstrate competency in [their] duty to protect the legal rights of children and families from the time of the initial contact through treatment."

317.    "A statute or regulation typically gives rise to a tort duty premised on public policy only if it is designed to protect the class of persons, in which the plaintiff is included, against the risk of the type of harm which has in fact occurred as a result of its violation." *Lorenz v. State*, 238 Ariz. 556, 558 (App. 2015).

318.    Dr. Christensen, Dr. Coffman, Ms. Kaplan-Siekmann, Ms. Burns, Ms. Quigley, Ms. Manjarrez, Mr. Sanez, Mr. Adams, Ms. LaMonte, Mr. Faust acted with gross negligence and breached their duty to protect the legal rights of Jessica when they failed to properly investigate whether DCS should remove E.F. from his parent's care before removing E.F. from his parent's care.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

319.   Dr. Christensen, Dr. Coffman, Ms. Kaplan-Siekmann, Ms. Burns, Ms. Quigley, Ms. Manjarrez, Mr. Sanez, Mr. Adams Ms. LaMonte, Mr. Faust and each of them, acted with gross negligence and breached their duty to protect the legal rights of Jessica by failing to complete a prompt and thorough investigation, as required by A.R.S. § 8-456(C)(1).

320.   Ms. Burns, Ms. Quigley, Ms. Manjarrez, Mr. Sanez, Mr. Adams, Ms. LaMonte, Mr. Faust acted with gross negligence and breached their duty to protect the legal rights of Jessica by failing to place E.F. with his maternal grandmother or a family of the Jewish faith (a less restrictive type of placement that was consistent with his best interest), and instead moving him to the more restrictive placement of placement with a foster family.

321.   Ms. LaMonte and Mr. Faust acted with gross negligence and breached their duty to protect the legal rights of Jessica by limiting Jessica's visits with her son to two time twice per week.

322.   Dr. Christensen acted with gross negligence and breached his duty to protect the legal rights of Jessica when he made representations to the court that were false and/or demonstrated a reckless disregard for the truth.

323.   As a direct and proximate result of Defendants' breach of their duty, Plaintiffs suffered irreparable harm and will continue to suffer, general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

**CLAIM TEN:**

**(Under established Arizona law, Defendants Ms. Burns, Ms. Quigley, Ms. Manjarrez, Mr. Sanez, Mr. Adams, Ms. LaMonte, Mr. Faust and each of them, are liable to Plaintiffs for exercising Gross Negligence in carrying out their duty to make reasonable and/or diligent efforts to preserve the family relationship.)**

324.   Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the paragraphs above.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

45

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

325.    At all relevant times, it was "well established that the State…has an affirmative duty to make all reasonable efforts to preserve the family relationship." *Mary Ellen C. v. Arizona Dep't of Econ. Sec.*, 193 Ariz. 185, 186, ¶ 1 (App. 1999). This duty is "defined [] on constitutional grounds." *Id*. at 192, ¶32. A "reasonable effort" requires the State "to undertake measures with a reasonable prospect of success." *Id*.

326.    At all relevant times, it was well established that DCS agents are "obligated to undertake measures with a reasonable probability of success." *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 192, ¶ 34 (App. 1999). DCS agents "must provide a parent with the time and opportunity to participate in programs designed to improve the parent's ability to care for the child." *Id*. at ¶ 37.

327.    At all relevant times, it was well established that "DCS has a constitutional obligation to attempt to unite" a parent with her children. *Donald W. v. Dep't of Child Safety*, 247 Ariz. 9, 24 ¶ 46 (App. 2019). "DCS is obliged to work with the parent toward a shared goal of reunification throughout the statutory period." *Id*. at 23, ¶ 49. At the "very least," reasonable efforts require "DCS to identify the conditions causing the child's out-of-home placement, provide services that have a reasonable prospect of success to remedy the circumstances as they arise throughout the time-in-care period, maintain consistent contact with the parent, and make reasonable efforts to assist the parent in areas where compliance proves difficult." *Id*. at 20, ¶ 50.

328.    A.R.S. § 8-533(B)(8) requires DCS agents to make a diligent effort to provide appropriate reunification services.

329.    At all relevant times, it was well-established that in determining whether DCS has complied with the law and made reasonable efforts to reunite a parent with their children, a juvenile court must view the "totality of the circumstances" and review DCS' actions during the entirety of time the child has been in DCS' care. *Donald W.*, 247 Ariz. at 19,¶ 49. "[A]bsent reasonable modifications to…rehabilitative services offered to a disabled parent, a department has failed to perform its duty under the ADA to reasonably

accommodate a disability and, in turn, its obligation to make reasonable efforts to rehabilitate the parent." *People in Interest of S.K.*, 440 P. 3d 1240, 1249 (Co. App. 2019).

330.    Ms. Burns, Ms. Quigley, Ms. Manjarrez, Mr. Sanez, Mr. Adams, Ms. LaMonte, and Mr. Faust and each of them, acted with gross negligence and breached their duty to make reasonable and/or diligent efforts to preserve the family relationship by failing to complete a prompt and thorough investigation, as required by A.R.S. § 8-456(C)(1).

331.    As a direct and proximate result of Defendants' gross negligence, Plaintiffs suffered irreparable harm, including but not limited to, the permanent loss of her parental rights, and will continue to suffer general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

### CLAIM ELEVEN:

**(Under established Arizona law, Defendant Faust is liable to Plaintiffs for the Gross Negligence exercised by Defendant employees of DCS in carrying out their duties.)**

332.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the paragraphs above.

333.    Faust owed a duty to Jessica to ensure that the employees, officers, and agents of DCS were qualified to serve in their respective roles before hiring and assigning employees to act as investigators and/or case managers for DCS.

334.    Faust operated with gross negligence and breached the duties described herein by failing to ensure that employees, officers, and agents of DCS were properly qualified before hiring and assigning employees to act as investigators and/or case managers for DCS.

335.    Faust also owed a duty to Jessica to ensure that the employees, officers, and agents of DCS were properly trained and possessed the skill and knowledge to perform their assigned job tasks in a competent manner.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

336.   Faust operated with gross negligence and breached the duties described herein by failing to ensure that the employees, officers, and/or agents of DCS were properly trained and possessed the skill and knowledge to perform their assigned job tasks in a competent manner

337.   Under Arizona law, specifically A.R.S. § 8-456(A)(2), DCS is required to ensure that all DCS investigators were properly trained on their "duty to protect the legal and due process rights of children and families from the time of the initial contact through case closure."

338.   Faust operated with gross negligence and breached the duties described herein by failing to ensure that all DCS investigators were properly trained on their duty to protect the legal and due process rights of children and families from the time of the initial contact through case closure.

339.   As a direct and proximate result of Defendant's breaches of these duties, Plaintiffs were damaged in that they, among other things, were denied their constitutionally protected individual and familial rights thereby suffering damages from the loss of familial relationships forever, and Plaintiffs will continue to suffer such damages into the future, all in an amount that will be demonstrated at trial.

**CLAIM TWELVE:**
**(Under 42 U.S.C. § 1983, Defendant Arizona Department of Child Safety is liable to Plaintiffs for the unconstitutional acts of its employees which were committed pursuant to a policy and/or practice of DCS.)**

340.   Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the paragraphs above.

341.   Defendant Arizona Department of Child Safety, is a "person" within the meaning of 42 U.S.C. § 1983 and subject to *Monell* liability. *Monell v. Dept. of Social Services*, 436 U.S. 658 (1978).

342.   DCS, and those individual defendants in their official capacity who had supervisory and/or policy making authority, had a duty to Jessica to establish,

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

48

implement, and/or follow policies, procedures, customs and/or practices which confirm and provide the protections guaranteed Jessica under the United States Constitution, including under the First and Fourteenth Amendments. This includes, without limitation, the protection of the right to familial relations; the right to privacy; and the rights to substantive and procedural due process.

343.    DCS established and/or followed policies, procedures, customs, and/or practices (hereinafter collectively referred to as "policy" or "policies"), which policies were the moving force behind the violation of Jessica's constitutional rights, including those under the First and Fourteenth Amendment of the United States Constitution. These policies, included, but are not limited to:

    a.  the policy of using trickery, duress, fabrications and/or false testimony and/or evidence, and in failing to disclose exculpatory evidence, in preparing and presenting reports and court documents to the juvenile court, causing an interference with parents' rights, including those as to familial relations;

    b.  the policy of inadequate training and/or supervision, and/or by failing to train and/or supervise its officers, agent, employees, and state actors, in providing the constitutional protections guaranteed to individuals and families, including those under the Fourteenth Amendment, when performing actions related to child abuse and dependency-type proceedings;

    c.  the policy of setting forth allegations in juvenile dependency petitions against parents claiming child abuse and/or neglect and/or other unsubstantiated allegations regardless of whether or not reasonable and articulable evidence exists at the time to support the claims set out in the petition under penalty of perjury;

    d.  the policy, practice, or custom of making knowingly false allegations of child abuse and/or neglect in juvenile dependency petitions signed under

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

penalty of perjury, motions, or other documents filed with the juvenile court as a means of intimidating parents, whether or not true, or forcing a parent to adjudicate a matter knowing that the courts most often sustain allegations, whether justified by extant evidence or not;

e.  the policy of fraudulently charging parents with child abuse and/or neglect where none exist; and

f.  the policy of failing to take appropriate action to ensure that appropriate and meaningful visitation occurs;

344.  The customs, policies, and/or practices listed herein are not exhaustive due to the pending nature of discovery and the privileged and protected records of investigative and juvenile dependency type proceedings. Jessica reserves their right to amend this pleading as more information becomes available.

345.  It was obvious that the policies described herein that were instituted and/or maintained by DCS would lead to constitutional violations like the violations suffered by Jessica, and DCS was deliberately indifferent to the consequent constitutional violations that would inevitably occur as a direct result of its policies.

346.  DCS was indifferent to the consequences that would be established and/or followed policies, procedures, customs, and/or practices (hereinafter collectively referred to as "policy" or "policies"), which policies were the moving force behind the violation of Jessica's constitutional rights, including those under the First and Fourteenth Amendment of the United States Constitution.

347.  DCS, breached its duties and obligations to Jessica including but not limited to, failing to establish, implement, and follow the correct and proper Constitutional policies, procedures, customs and practices; by failing to properly select, supervise, train, control, and review its agents and employees as to their compliance with Constitutional safeguards; and by permitting the DCS employees to engage in the unlawful and unconstitutional conduct alleged herein.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

348.    DCS, knew, or should have known, that by breaching the above-mentioned duties and obligations that it was reasonably foreseeable that DCS employees would, and did, cause Jessica to be injured and damaged by DCS's wrongful policies, or deliberate lack thereof, or deliberate indifference to the need for such policies and/or training, and other acts as alleged herein, and that such breaches occurred in the contravention of public policy and their legal duties and obligations to Jessica; and that such policies subjected them to injunctive relief which Jessica asserts herein.

349.    These actions, and/or inactions, of DCS are the moving force behind, and direct and proximate cause of Plaintiffs' injuries, as alleged herein; and as a result, Plaintiffs have sustained general and specific damages to an extent and in an amount to be proven at trial. Plaintiffs have incurred and will continue to incur, attorneys' fees, costs, and expenses, including those authorized by 42 U.S.C. § 1983, to an extent and in an amount subject to proof at trial.

**CLAIM THIRTEEN:**
**(Under established Arizona law, Defendants Jason and Leigh Ann Treguboff are liable to Jessica for Defamation)**

350.    Plaintiffs re-alleges and incorporates by reference each and every allegation set forth in the paragraphs above.

351.    Defendant Mrs. Treguboff made a false statement concerning Jessica when she told E.R. that Jessica was dangerous.

352.    This statement was defamatory and harmful as Jessica is not a dangerous mother.

353.    Mrs. Treguboff's statement was published to third parties, including to E.F.

354.    Mrs. Treguboff knew or should have known her statement was inaccurate.

355.    Jessica was damaged by this statement.

356.    Jessica will continue to suffer such damages into the future, all in an amount that will be demonstrated at trial.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

**CLAIM FOURTEEN:**

**(Under established Arizona law, Defendants Jason and Leigh Ann Treguboff are liable to Plaintiffs for Intentional Infliction of Emotional Distress)**

357.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the paragraphs above.

358.    The Treguboff's conduct was extreme and outrageous. As foster parents, they subjected E.F. to extreme bullying in their home, exposure to alcohol use, name-calling for his medical issues related to urination and defecation, did not provide accurate medical information to E.F.'s medical team nor did they follow E.F.'s medical team's advice, and did not permit E.F. to practice his Jewish faith.

359.    The Treguboffs intended to cause E.F. and Jessica's emotional distress or had reckless disregard for the certainty that distress would result from their conduct. Mrs. Treguboff told Jessica's son that his mother "was dangerous." The Treguboffs allowed bullying in their home. E.F. was shamed for his medical issues, called gay, dumb bitch, blocked from using the bathroom, and suffered a bite wound while under the care of the Treguboffs.

360.    The Treguboff's conduct caused E.F. and Jessica severe emotional distress.

361.    E.F. and Jessica will continue to suffer such damages into the future, all in an amount that will be demonstrated at trial.

**CLAIM FIFTEEN:**

**(Under established Arizona law, Defendants Jason and Leigh Ann Treguboff are liable to Jessica for Negligent Infliction of Emotional Distress)**

362.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the paragraphs above.

363.    Jessica witnessed injuries to her son while he was under the foster care of the Treguboffs.

364. The Treguboffs are liable for the injuries (both mental and physical) E.F. suffered while he was fostering in their home.

365. Jessica suffered mental anguish as a result of the mental and physical injuries her son suffered while under the care of the Treguboffs.

366. Jessica will continue to suffer such damages into the future, all in an amount

**CLAIM SIXTEEN:**

**(Defendant PCH is liable to Plaintiffs, and each of them, for the Negligence exercised by Defendant employees or agents of PCH in carrying out their duties.)**

367. Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the paragraphs above.

368. Defendant PCH owed a duty to Plaintiffs to ensure that the employees, officers, and agents of PCH were qualified to serve in their respective roles before hiring and assigning them to act as medical doctors, nurse practitioners, or other medical professionals for PCH.

369. Defendant PCH also owed a duty to Plaintiffs to ensure that the employees, officers, and agents of DCS were properly trained and possessed the skill and knowledge to perform their assigned job tasks in a competent manner.

370. As set forth above, Defendant PCH operated with negligence and breached these duties.

371. As a direct and proximate result of Defendant's breaches of these duties, Plaintiffs were damaged in that they, among other things, were denied their constitutionally protected individual and familial rights thereby suffering damages from the loss of familial relationships for extended periods of time during formative times in the lives of the child and the family, and Plaintiffs will continue to suffer such damages into the future, all in an amount that will be demonstrated at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief as follows:

B. General damages and special damages according to proof, but in no event less than $15,000,000, including, but not limited to economic losses, medical costs, hedonic damages, psychological trauma, and emotional distress;

C. For injunctive relief in the form of DCS agreeing to provide training to all DCS case workers regarding:

    a. When exigent circumstances exist that justify the unwarranted seizure of a child;

    b. The psychological trauma and harm suffered by children and family that occurs when DCS removes a child from the custody of his or her parent;

    c. That prior to removing a child from the custody of his or her parent, DCS has a legal and constitutional obligation to conduct a thorough investigation into any allegations justifying removal, including investigating facts, witnesses, and evidence that refutes the allegations;

    d. That it is a violation of the Constitutional rights of children and parents to make misrepresentations or omissions to the court which are false and/or which demonstrate a reckless disregard for the truth; and;

    e. That facilitating regular contact between parent and child through visitation is perhaps the most basic and essential of the services provided by the State and thus all reasonable efforts must be expended to ensure that a visitation occurs regularly and as scheduled.

D. The training described in (B) above must be provided, at a minimum, annually to all DCS case workers and must be included in the training provided to persons upon their becoming a DCS case worker;

E. Injunctive relief in the form of PCH agreeing to provide training for every staff member involved in providing medical treatment to minors that until a court

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

orders otherwise, the parent or legal guardian retains the sole legal authority to procure, solicit to perform, and/or arrange for the performance of a medical screening or medical treatment for a minor.

F.  For taxable costs and pre- and post-judgment interest to the extent permitted by law;

G.  For punitive and/or exemplary damages to the extent permitted by law and in an amount appropriate to punish the wrongful conduct alleged herein and to deter such conduct in the future;

H.  For attorney's fees, costs, and expenses pursuant to 42 U.S.C. § 1988 and state law, as applicable; and,

I.  For such other relief as the Court deems just and proper under the circumstances.

**RESPECTFULLY SUBMITTED** this 22th day of April 2022.

MILLS + WOODS LAW PLLC

By_____/s/ Thomas A. Connelly_____
    Thomas A. Connelly
    Robert T. Mills
    Sean A. Woods
    5055 North 12th Street, Suite 101
    Phoenix, AZ 85014

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
    DeeAn Gillespie Strub
    7319 North 16th Street
    Phoenix, AZ 85020
    *Attorneys for Plaintiffs*

MILLS + WOODS LAW PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556