WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jessica Fidler,<br><br>   Plaintiff,<br><br>v.<br><br>State of Arizona, et al.,<br><br>   Defendants. | No. CV-22-00300-PHX-ROS<br><br>**ORDER** |

  Plaintiff Jessica Fidler alleges state officials took temporary custody of her son, E.F., in 2020 because of an embarrassing interaction one defendant had with Fidler in 2017. According to Fidler, two doctors, five employees of the Arizona Department of Child Safety, and an independent social worker all agreed to take custody of E.F. as part of a revenge campaign stemming from the 2017 interaction. Fidler's claims are premised on this far-reaching agreement, but she has not alleged sufficient facts under the law to render those claims plausible. The Third Amended Complaint, Fidler's fourth attempt to state claims, will be dismissed without leave to amend.

**BACKGROUND**

  The following facts are taken from the Third Amended Complaint. Many of these facts differ significantly from the facts set forth in dismissing the Second Amended Complaint. (Doc. 119).

  Fidler's son, E.F., was born in 2011. Fidler believes E.F. has always suffered from a wide array of medical problems and Fidler has sought extensive medical treatment for

E.F. The relevant events began in 2017. On June 29, 2017, E.F. was admitted to Phoenix Children's Hospital ("PCH"). On July 1, 2017, Dr. Bo Borch-Christensen evaluated E.F. and spoke with Fidler. According to the Third Amended Complaint, Dr. Christensen and Fidler disagreed on the appropriate treatment for E.F. (Doc. 122 at 9-10). In particular, Dr. Christensen believed E.F. was receiving too many medical interventions while Fidler believed E.F. was receiving appropriate care. As a result of this disagreement, Fidler prohibited Dr. Christensen from ever treating E.F. again.

During the years following that 2017 interaction, E.F. continued to receive extensive medical treatments at various facilities, including PCH. Of particular importance, in the summer of 2019 medical providers at PCH and elsewhere recommended E.F. undergo an ileostomy which "involves cutting a hole in the abdominal wall and leaving the hole open." (Doc. 122 at 11). Two doctors at PCH agreed "the ileostomy would be beneficial for E.F.," but the surgeon at PCH who would perform the operation "disagreed." The PCH doctors who believed the ileostomy was merited "recommended [Fidler] take E.F. to Banner hospital for another opinion." (Doc. 122 at 11). After additional testing at Banner, E.F.'s doctors concluded an ileostomy was not appropriate. Instead, E.F. had a "hemi-colectomy" to remove part of his bowel. (Doc. 122 at 12). In October 2019, E.F. was admitted to PCH for abdominal pain. Fidler alleges, Dr. Christensen "somehow learned some details of why E.F. was hospitalized." (Doc. 122 at 12). Fidler then alleges, "upon information and belief," Dr. Christensen "discussed E.F.'s care" with the PCH physician who was caring for E.F. at that time. (Doc. 122 at 12). The complaint does not allege Dr. Christensen took any actions after that discussion.

In "late January 2020" Fidler took E.F. to PCH because E.F. "was running a fever." (Doc. 122 at 14). A PCH emergency room doctor "ran a test to see if there was an infection." (Doc. 122 at 14). On January 28, 2020, "the results came back negative for an infection." (Doc. 122 at 14). The day after the test results, Dr. Christensen called the child abuse hotline maintained by the Arizona Department of Child Safety ("DCS") and reported Fidler may be abusing E.F. During that call, Dr. Christensen stated Fidler had taken E.F.

to Banner "to have an unnecessary bowel surgery" and E.F. was now on a feeding tube. As a result of Dr. Christensen's call, DCS opened an investigation.

On February 20, 2020, Dr. Christensen and Dr. Kathryn Coffman, another PCH doctor, attended a meeting with DCS investigator Lisa Burns and "DCS service provider [Drue] Kaplan-Siekmann joined by phone." (Doc. 122 at 15). During that meeting, Dr. Christensen allegedly made eight statements the complaint identifies as false. Some of the allegedly false statements, however, were accurate given allegations elsewhere in the complaint.

During the February meeting Dr. Christensen allegedly stated Fidler had taken "E.F. to see doctors in Cincinnati and in California." (Doc. 122 at 15). The complaint alleges this statement was "false." But elsewhere the complaint alleges E.F. was "seen by medical specialists in Cincinnati, Ohio and at Stanford hospital in California." (Doc. 122 at 8). Dr. Christensen's statement, therefore, was not false under the complaint's allegations. Dr. Christensen also stated "[a]fter PCH doctors refused to perform an unnecessary bowel surgery (i.e., an ileostomy), [Fidler] took E.F. to Banner." (Doc. 122 at 15). The complaint alleges that was false but, as previously noted, the complaint alleges that is what happened. (Doc. 122 at 11). There is no explanation in the complaint for identifying the statements as "false" when they are consistent with Fidler's own allegations.

The remaining false statements by Dr. Christensen at the February 2020 meeting were Fidler "likely has Munchausen by Proxy," Fidler "was very confrontational with doctors," Dr. Christensen had treated E.F. on "multiple occasions," "E.F. did not require the medical treatments he received," the specialists in Cincinnati "found E.F to have no [bowel] issues," and Banner surgeons had performed an ileostomy on E.F. (Doc. 122 at 15). The complaint alleges these false statements, and all subsequent actions by Dr. Christensen and every other defendant, were due to Dr. Christensen having a personal vendetta against Fidler.

According to the complaint, Dr. Christensen's reports of potential abuse and false statements were caused by his inability "to endure the frequent reminders of [Fidler's] lack

- 3 -

of faith in his abilities." (Doc. 122 at 13). E.F. visited PCH many times between July 1, 2017, and January 29, 2020. According to the complaint, these visits resulted in Dr. Christensen being "reminded that [Fidler] believe[d] that he was incompetent." Thus, the complaint alleges, "upon information and belief," Dr. Christensen's peers repeatedly asked him "why he could not treat E.F." (Doc. 122 at 13). Those questions allegedly resulted in Dr. Christensen being "humiliated in front of his peers" because he "had to explain this situation." (Doc. 122 at 14). Eventually, "[Dr.] Christensen had enough of the humiliation of not being able to treat E.F." and he "called the DCS Hotline in retaliation." That retaliation continued at the February 20, 2020, meeting. (Doc. 122 at 14).

The complaint provides no hint why Dr. Christensen's alleged personal humiliation was enough to convince seven other individuals to work with Dr. Christensen to remove E.F. from Fidler's custody. But Dr. Christensen's quest for revenge is described as the sole basis for the subsequent chain of events. The DCS employee assigned to investigate Dr. Christensen's complaint was DCS investigator Lisa Burns. From the very outset Burns decided to "ignore[] the fact that Christensen was motivated by pride, rather than a desire to protect E.F." (Doc. 122 at 16). Burns allegedly decided to conduct an incompetent investigation to ensure E.F. was removed from Fidler's custody.

During her investigation Burns did not speak with E.F.'s doctors and only spoke with E.F.'s home-health nurse "briefly." (Doc. 122 at 17). Burns also failed to "investigate or consider" Fidler's "documented anxiety disorder." (Doc. 122 at 17). The complaint alleges Fidler's anxiety disorder was "the explanation for [E.F.'s] increased doctor visits." (Doc. 122 at 36). The complaint does not allege how Burns would have conducted an investigation into Fidler's mental health nor are there allegations how knowledge of Fidler's anxiety disorder would have impacted the investigation.

After intentionally failing to conduct a sufficient investigation, Burns and her supervisor, Melinda Quigley, realized that "something had to be done to satisfy" the "statutory duty" to investigate Dr. Christensen's statements. (Doc. 122 at 18). It is difficult to understand the complaint's logic in alleging Burns deliberately chose to conduct an

incompetent investigation but then Burns and Quigley were concerned that they needed to comply with the "statutory duty" to investigate. If the complaint is accepted as true, Burns and Quigley knowingly wished to remove E.F. to exact revenge on Dr. Christensen's behalf. It is implausible Burns and Quigley would have this motivation but also be concerned that they comply with the governing statutes by conducting an appropriate investigation. At any rate, Burns and Quigley agreed to hire Drue Kaplan-Siekmann "to perform a forensic review of E.F.'s medical records." (Doc. 122 at 18).

Kaplan-Siekmann was a "freelance contractor" DCS hired to review cases. (Doc. 122 at 18). Burns and Quigley allegedly chose Kaplan-Siekmann because she was willing "to rubberstamp" Dr. Christensen's false claims. (Doc. 122 at 18). And Kaplan-Siekmann allegedly wished "to keep DCS satisfied" so she agreed to reach whatever result Burns and Quigley requested. (Doc. 122 at 19). As with the allegations regarding Burns, the complaint's allegations regarding Kaplan-Siekmann make very little sense.

The complaint alleges Kaplan-Siekmann had "no medical background," very little relevant training, and was not competent to review medical records. But the complaint then alleges Kaplan-Siekmann's should have reviewed more of E.F.'s medical records than she reviewed. If Kaplan-Siekmann was not competent to review medical records, it is unclear why the complaint alleges Kaplan-Siekmann erred by not reviewing more medical records. The complaint also alleges Kaplan-Siekmann was unqualified to reach any opinions and her report issued on March 19, 2020, was simply a regurgitation of Dr. Christensen's false allegations. The complaint describes Kaplan-Siekmann as acting with "malice," indicating Kaplan-Siekmann knew her report was false. (Doc. 122 at 36). But accepting the allegations that Kaplan-Siekmann lacked the requisite background and training to reach reliable opinions, the complaint does not allege how Kaplan-Siekmann could have known Dr. Christensen's reports were false.

After Burns' intentionally incompetent investigation and Kaplan-Siekmann's intentionally false report, DCS filed a dependency petition with the juvenile court. The petition, signed by Burns, was filed on March 30, 2020. The petition contained "the same

- 5 -

false allegations" from Dr. Christensen and Kaplan-Siekmann which Burns recited and Quigley "rubber-stamped." (Doc. 122 at 22). The juvenile court approved temporary custody and E.F. was removed from Fidler's custody on April 3, 2020. Upon gaining custody of E.F., Burns took E.F. to PCH. Burns allegedly waited until April 3 to take custody of E.F. so she could "control the investigation, through Dr. Christensen, and expedite the placement of E.F. in foster care."[1] (Doc. 122 at 23). After being examined by Dr. Christensen, E.F. was admitted to PCH.

Shortly after E.F.'s admission, Dr. Christensen and Burns agreed to ask Dr. Coffman, the PCH physician who attended the February 2020 meeting, to review E.F.'s medical records. They chose Dr. Coffman because they knew she "would perform only a cursory review" and it was "her custom and practice to align herself with DCS's position." (Doc. 122 at 24). Dr. Coffman "wrote a letter to DCS summarizing her findings." (Doc. 122 at 25). In preparing that letter Dr. Coffman allegedly "did not conduct her own review of E.F.'s medical records" but chose to "simply re-count[] Christensen's false allegations." (Doc. 122 at 25). The complaint alleges Dr. Coffman "knew or should have known" the contents of her letter were false. However, given the allegation that Dr. Coffman did not conduct a review of E.F.'s medical records, it is not clear how Dr. Coffman either "knew or should have known" she was conveying inaccurate information to DCS.

While E.F. was hospitalized in April 2020, Dr. Christensen "removed all of the medical treatments that E.F. was receiving." (Doc. 122 at 27). Approximately two weeks after being removed from Fidler's custody, E.F. was placed with non-Jewish foster parents. E.F. remained with those foster parents from April 17, 2020, through November 3, 2020. That placement was selected by Marisol Manjarrez, a DCS caseworker. Manjarrez allegedly was aware of "Jewish placement options" but she opted to place E.F. with non-

---

[1] The complaint contains allegations regarding the formation of an "agent/subagent" relationship between Burns and Dr. Christensen. The complaint alleges that, once this relationship was in place, all of Dr. Christensen's knowledge "was imputed to Burns, Quigley, and DCS." (Doc. 122 at 23). The complaint also alleges all the defendants knowingly agreed to seize E.F. based on false premises. Because the complaint alleges all defendants knew there was no abuse occurring, the allegations regarding an "agent/subagent" relationship allowing for imputation of Dr. Christensen's knowledge appear unnecessary.

Jewish foster parents. (Doc. 122 at 27). At some unspecified time during his stay with foster parents, E.F.'s bowel symptoms started to "flare up." (Doc. 122 at 27). The complaint alleges the "flare up" was due to Dr. Christensen ceasing E.F.'s medical treatments in early April 2020. (Doc. 122 at 27). E.F.'s foster parents interfered with E.F.'s religious beliefs by insisting he cut his hair on a "Jewish holy day," forcing E.F. to eat pork, insisting E.F. eat meat and dairy together, and prohibiting E.F. from attending Jewish religious services. (Doc. 122 at 30-31).

While E.F. was with the foster parents, Manjarrez limited Fidler's visits and "would not allow [Fidler] to attend or participate in E.F.'s doctors' appointments." (Doc. 122 at 28). Manjarrez's supervisors, Kimmesha Edwards and Francisco Saenz[2] III, approved Manjarrez's decision to seek severance and adoption instead of planning for E.F. to return to Fidler. (Doc. 122 at 28). The complaint does not explicitly allege Edwards and Saenz were aware these events were occurring as a result of Dr. Christensen's desire to retaliate against Fidler for the 2017 encounter. However, that appears to be Fidler's theory.

Based on these events, Fidler, on behalf of herself and on behalf of E.F., alleges the following claims in the Third Amended Complaint:

- A § 1983 claim against Dr. Christensen, Burns, Quigley, Kaplan-Siekmann, and Dr. Coffman for violating her right to freedom of association under the First Amendment and due process under the Fourteenth Amendment;

- A § 1983 claim against Dr. Christensen, Burns, Quigley, Kaplan-Siekmann, and Dr. Coffman for judicial deception in the submission to the juvenile court seeking temporary custody of E.F.;

- A § 1983 claim against Dr. Christensen, Burns, Quigley, Kaplan-Siekmann, and Dr. Coffman for conspiring to violate Fidler's rights to due process;

- A § 1983 claim against Burns, Quigley, Manjarrez, Saenz, and Edwards for violating Fidler's "right to Due Process under the Fourth and Fourteenth Amendments for failing to make reasonable efforts to preserve the family relationship";

---
[2] The Court previously informed Fidler the correct name was "Saenz" not "Sanez." (Doc. 119 at 6 n.3). Despite that, the amended complaint continues to refer only to "Sanez."

- A § 1983 claim against Manjarrez, Edwards, and Saenz for violating Fidler's right to "freedom of religion" under the First Amendment;

- A § 1983 claim against Burns, Quigley, Manjarrez, Saenz, and Edwards for violating Fidler's "due process" right to make medical decisions for E.F.;

- A § 1983 claim against Burns, Quigley, Manjarrez, Saenz, and Edwards for violating Fidler's "due process" right to be with E.F. during medical treatments;

- A "negligence per se" claim against Dr. Christensen and Dr. Coffman;

- A "gross negligence" claim against Dr. Christensen and Dr. Coffman;[3]

- A medical malpractice claim against Dr. Christensen for care provided to E.F.;

- A "negligence" claim against PCH that appears to be based on hiring or retaining unqualified employees.

Fidler also alleged claims against the foster parents but those claims have been dismissed. The remaining defendants have organized into three groups and each group has filed a motion to dismiss. Defendants Burns, Quigley, Manjarrez, Edwards, and Saenz filed a joint motion. Defendants Dr. Christensen, Dr. Coffman, and PCH filed a joint motion. And Defendant Kaplan-Siekmann filed her own motion.

**ANALYSIS**

Fidler believes an interaction with Dr. Christensen in 2017, and his ongoing "embarrassment," fueled an agreement amongst eight individuals to take custody of E.F. and mistreat him while in state custody. That factual premise underlies all claims in the Third Amended Complaint but Fidler has not alleged sufficient facts to make it plausible there was such an agreement. All claims will be dismissed without leave to amend.

**A. Factual Allegations are Implausible**

---

[3] The complaint includes Kaplan-Siekmann as a defendant on the "negligence per se" and "gross negligence claims." However, the parties agree those claims are not being pursued against Kaplan-Siekmann. (Doc. 143 at 3).

"Establishing the plausibility of a complaint's allegations is a two-step process that is context-specific and requires the reviewing court to draw on its judicial experience and common sense." *Eclectic Properties E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 995–96 (9th Cir. 2014). A court must first identify those allegations "that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 996. Second, a court must "assume the[ ] veracity of well pleaded factual allegations and determine whether they plausibly give rise to an entitlement to relief." *Id.* The factual allegations must be sufficiently plausible such "that it is not unfair to require the opposing [parties] to be subject to the expense of discovery and continued litigation." *Id.* And "[w]hen considering plausibility, courts must also consider an obvious alternative explanation for [defendants'] behavior." *Id.*

According to the Third Amended Complaint, Dr. Christensen was upset in 2017 when he was told he could not treat E.F. again. For the next two and a half years, Dr. Christensen allegedly was humiliated when E.F. received treatment at PCH. The complaint alleges these humiliating events occurred based "upon information and belief." Thus, upon information and belief, Dr. Christensen's peers "asked [Dr.] Christensen why he could not treat E.F." (Doc. 122 at 13). This was humiliating to Dr. Christensen because he "had to explain this situation" many times. (Doc. 122 at 14). The complaint does not contain factual allegations regarding which colleagues Dr. Christensen had these discussions with over the years.[4] Nor does the complaint allege when these discussions occurred. The timing of these discussions is of special importance because it is highly implausible Dr. Christensen would wait more than two years to embark on a convoluted attempt at revenge.

The complaint alleges Dr. Christensen eventually "had enough of the humiliation" after he learned Fidler had sought treatment for E.F. for an alleged infection in 2020. (Doc. 122 at 14). When the test results from E.F.'s 2020 visit came back negative, Dr.

---

[4] The complaint alleges, upon information and belief, "Dr. Mangone" discussed E.F. with Dr. Christensen sometime "between October 2019 and January 2020." (Doc. 122 at 12). Given the other allegations of the complaint, this allegation appears to be a guess rather than a recital of something Fidler knows or has sufficient reason to believe. Moreover, the complaint does not identify the colleagues who asked Dr. Christensen about E.F. between 2017 and 2019.

- 9 -

Christensen decided to embark on a quest for revenge by calling the DCS hotline.[5] If, however, Dr. Christensen was motivated by embarrassment with his colleagues, it is unclear why the complaint links the negative test results to his decision to contact DCS. That is, the complaint describes Dr. Christensen's initial report to DCS as being prompted by the test results, not by any allegedly humiliating interaction with a colleague.

After his report, the complaint alleges Dr. Christensen somehow recruited Burns to help with his revenge campaign. There are no allegations why Burns would be interested in helping Dr. Christensen vindicate his embarrassment. But Dr. Christensen and Burns then convinced Burns' supervisor, Quigley, to help with obtaining retribution. Again, there are no factual allegations why Quigley would agree to pursue this goal. Next, Burns and Quigley recruited Kaplan-Siekmann because she would "rubberstamp Christensen's false claims." (Doc. 122 at 18). This alleged willingness to "rubberstamp" allegations does not explain why Kaplan-Siekmann agreed to seek revenge for Dr. Christensen's embarrassment.

After Kaplan-Siekmann started working on the case, and perhaps after Kaplan-Siekmann prepared her report stating there was possible abuse, Dr. Christensen and Burns allegedly convinced Dr. Coffman to help. The complaint alleges Dr. Coffman knew E.F. was not being abused and the only basis for the investigation was Dr. Christensen's "malicious motive to redeem his reputation and even the score with [Fidler]." (Doc. 122 at 25). The complaint does not allege how Dr. Coffman knew this nor does it allege why Dr. Coffman would have agreed to help Dr. Christensen in this way. For unexplained reasons, Dr. Coffman prepared a knowingly false letter restating Dr. Christensen's allegations.

After the juvenile court approved temporary custody of E.F., Burns was able to convince another DCS employee, Manjarrez, that Fidler and E.F. should pay a price for

---

[5] Fidler argues the Court should "infer [Dr.] Christensen is a proud man, vulnerable to humiliation if he is publicly questioned" based on his interactions with Fidler in 2017. (Doc. 156 at 6). It is unusual to request the Court make inferences regarding a defendant's personality when assessing the plausibility of claims. Fidler cites no authority that inferences regarding a defendant's personality type are appropriate.

causing Dr. Christensen's embarrassment. Allegedly to increase the injury to Fidler and E.F., Manjarrez refused to place E.F. in a Jewish home. Manjarrez's supervisors, Edwards and Saenz, knew the whole sequence of events was due to Dr. Christensen's "malice" and there was no abuse happening. (Doc. 122 at 28). Despite that knowledge, and for reasons not alleged in the complaint, Edwards and Saenz approved the continuation of the revenge campaign. Finally, after E.F. was returned to Fidler's custody, Edwards and Saenz took a final act of vengeance on behalf of Dr. Christensen by approving Marjarezz's decision to implement "a family reunification team" instead of closing the case entirely. (Doc. 122 at 29).

There are no factual allegations offering a plausible motivation for every individual involved in handling E.F.'s case to inflict harm on Fidler and E.F. A plaintiff is not always required to plead the defendants' motivations. But "[t]he level of factual specificity needed to satisfy [Rule 8's] pleading requirement will vary depending on the context." *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1107 (9th Cir. 2013). Given that the entire complaint is dependent on all defendants agreeing to harm Fidler, some factual specificity regarding defendants' motivation was needed. At the very least, some factual allegations the various defendants even knew each other was necessary. It is implausible eight people, many with no connection to Dr. Christensen, set out to seize custody of E.F. and place him in an inappropriate foster home solely because Dr. Christensen was embarrassed.

When assessing plausibility, the Court must "consider an obvious alternative explanation for [Defendants'] behavior." *Eclectic Properties E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014). The "obvious alternative explanation" here is that Dr. Christensen believed Fidler was seeking excessive medical interventions for E.F. In fact, in a previous complaint Fidler alleged Dr. Christensen made a note in 2017 reflecting his opinion that E.F. was receiving excessive medical care. (Doc. 45 at 16). Fidler also alleged "multiple members of the hospitalist team" believed E.F. was receiving excessive care. (Doc. 45 at 17). Instead of a malicious motive based on embarrassment,

the "obvious alternative explanation" is that Dr. Christensen believed E.F. was being mistreated.

In January 2020, Fidler took E.F. to PCH for testing. When Dr. Christensen learned those test results were negative, he concluded Fidler had again sought medical treatment when it may not have been merited. Based on that, Dr. Christensen contacted DCS. Burns investigated, Kaplan-Siekmann conducted a review of some records, and Dr. Coffman also reviewed some aspects of E.F.'s medical records. Burns, Kaplan-Siekmann, and Dr. Coffman concluded abuse was possible. As a result, the juvenile court approved removal of E.F. from Fidler. Manjarrez believed the investigation had been adequate and placed E.F. with foster parents she deemed acceptable. Rather than seeking to remedy the humiliation of Dr. Christensen, Edwards and Saenz viewed Manjarrez's actions as appropriate under the circumstances. Overall, instead of an implausible chain of events involving an explicit agreement amongst eight individuals to vindicate Dr. Christensen's feelings, the obvious alternative explanation is Defendants' behavior was the routine handling of abuse allegations. Crucially, there are no plausible factual allegations that "exclude the possibility [this] alternative explanation is true." *Eclectic*, 751 F.3d at 996-97.

There is "a sheer possibility" the eight defendants set out to harm Fidler and E.F. to satisfy Dr. Christensen. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). But the current "complaint pleads facts that are merely consistent with [Defendants'] liability." *Id.* Thus, the complaint "stops short of the line between possibility and plausibility of entitlement to relief." *Id.* Because Fidler's basic factual theory is not plausible, all the § 1983 claims will be dismissed.

Fidler's implausible factual theory also dooms the "negligence per se" and "gross negligence" claims. Those claims appear to be based on a convoluted theory that Burns "delegated" her statutory duties as a DCS investigator to Dr. Christensen, Kaplan-Siekmann, and Dr. Coffman. Those three individuals then breached the duties of DCS investigators set out in statute. *See* A.R.S. § 8-529. The theory appears to be that Burns

delegated this authority to ensure Dr. Christensen's goal of revenge could be obtained. There are no factual allegations rendering it plausible Burns would pursue this course to help Dr. Christensen nor are there factual allegations that Burns had legal authority to "delegate" her statutory duties.

Fidler's medical malpractice claim does not fail because of the implausible agreement amongst all defendants. Instead, this claim fails because the allegations tying Dr. Christensen's treatment to E.F.'s symptoms are entirely speculative. The medical malpractice claim is based on treatment E.F. received in April 2020. That treatment allegedly led to a "flare up" of E.F.'s bowel symptoms sometime between April 2020 and November 2020. But the complaint alleges these "flare ups" happened routinely "prior to DCS's involvement." (Doc. 122 at 9). The complaint alleges E.F.'s symptoms "had largely resolved" as of October 2019, meaning prior to Dr. Christensen's treatment. But claiming treatment in April 2020 resulted in "flare ups" potentially seven months later is insufficient to state a claim for medical malpractice. Given the overall implausibility of the complaint, more specific allegations regarding treatment and injury were necessary.

Finally, the complaint alleges a negligence claim directly against PCH. This claim does not depend on the implausible eight-person agreement. The claim still fails, however, because it is not supported by any meaningful factual allegations. The complaint alleges PCH owed a duty to ensure the employees it hired were qualified and properly trained. This sounds like a "negligent hiring" or "negligent retention" claim. *See Steven v. Swift Transp. Co.*, 2010 WL 3723119, at *2 (Ariz. Ct. App. 2010) (identifying "negligent hiring" and "negligent retention" as distinct claims against employer). But the complaint does not contain any allegations how PCH erred in hiring or retaining Dr. Christensen or Dr. Coffman. Therefore, the claim against PCH must be dismissed.

### B. Miscellaneous Flaws in Complaint

Beyond implausibility and the various flaws undermining the state law claims, the Third Amended Complaint suffers from a wide variety of other flaws. Perhaps the most obvious flaw is that Fidler realleged a standalone claim for "conspiracy." The Court

previously informed Fidler "[c]onspiracy is not itself a constitutional tort under § 1983." (Doc. 119 at 25). That statement was a direct quote from an en banc Ninth Circuit opinion. *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 935 (9th Cir. 2012). The Court went on to instruct Fidler "conspiracy should not be a separate claim." (Doc. 119 at 26). Despite that information, Fidler again alleged a standalone claim for "conspiracy." (Doc. 122 at 41).

Another flaw related to Fidler's improper conspiracy claim is the complaint's identification of Dr. Christensen and Dr. Coffman as "state actors" at all relevant times. (Doc. 122 at 50). This allegation appears to be based on the implausible theory that Burns "delegated" her statutory obligations as a DCS investigator to Dr. Christensen and Dr. Coffman. There is no meaningful explanation how this alleged delegation occurred nor is there any explanation why this rendered Dr. Christensen and Dr. Coffman "state actors."

Yet another flaw is the complaint lists the state of Arizona as a defendant in the caption and in its body. (Doc. 122 at 1, 3). It has never been clear if Fidler is attempting to assert claims against the State of Arizona. At the very least, there is no explanation for Fidler continuing to identify the State of Arizona as a defendant but never including the State of Arizona as a defendant on any particular claims.

The complaint's final flaw is Fidler's attempt to impose liability on supervisors based on the actions of their subordinates. The Court previously informed Fidler this was not a viable way to pursue supervisory liability. (Doc. 119 at 9). Despite that, the complaint again alleges claims against supervisors, Edwards and Saenz, based merely on some general allegations that they approved the conduct of their subordinates. (Doc. 122 at 28-29). Fidler is incapable or unwilling of pleading viable claims for supervisory liability.

**C. Amendment Would be Futile**

Fidler has repeatedly amended her complaint, yet the Third Amended Complaint did not fix obvious flaws the Court identified. The history of Fidler's allegations during this case establish it would be futile to grant further leave to amend.

Fidler's original complaint alleged fifteen claims, including claims brought under

42 U.S.C. § 1983, against various combinations of sixteen defendants.[6] Included as defendants on some of the § 1983 claims were high-level supervisors at DCS, including the agency's head. There were no allegations those individuals were involved in the relevant events other than conclusory statements that they "ratified" their subordinates' conduct. (Doc. 1-3 at 30). It should have been obvious that such § 1983 claims against supervisors were not viable. *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (noting "vicarious liability is inapplicable to . . . § 1983 suits" meaning "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution").

Fidler's original complaint did not allege Dr. Christensen was driven to remove E.F. from Fidler's custody because of embarrassment in front of his colleagues. Instead, the complaint alleged Dr. Christensen's made a report to DCS based "on inaccurate information and inaccurate medical history reports." (Doc. 1-3 at 30). That seemed to indicate Dr. Christensen had been negligent, not malicious. Regardless of Dr. Christensen's motivation, the original complaint explicitly based one § 1983 claim against him on "his testimony under oath" during the juvenile dependency proceedings. (Doc. 1-3 at 36). It should have been obvious Fidler could not base § 1983 claims on Dr. Christensen's in-court testimony. *See, e.g.*, *Lisker v. City of Los Angeles*, 780 F.3d 1237, 1241 (9th Cir. 2015) (noting "[w]itnesses . . . are absolutely immune from liability for testimony at trial"). Before any defendant answered the original complaint, Fidler filed an Amended Complaint. (Doc. 1-3 at 114).

Fidler's Amended Complaint again included obviously defective § 1983 claims against high-level DCS supervisors based only on those supervisors "ratif[ying]" their subordinates' conduct. (Doc. 1-3 at 139). And the Amended Complaint again improperly based claims against Dr. Christensen on his in-court testimony during the juvenile proceedings. (Doc. 1-3 at 141, 148). After some defendants moved to dismiss, Fidler filed

---

[6] The named defendants were the State of Arizona, DCS, Burns, Quigley, Manjarrez, Edwards, Saenz, Bryan Adams, Michael Faust, Amber Lamonte, Kaplan-Siekman, PCH, Dr. Christensen, Dr. Coffman, Jason Treguboff, and Leigh Ann Treguboff. (Doc. 1-3 at 8-9)

a Second Amended Complaint. (Doc. 45). But even the Second Amended complaint still named supervisors without allegations of their personal involvement and based claims on Dr. Christensen's in-court testimony. (Doc. 45 at 35). In responding to the Second Amended Complaint, most defendants moved to dismiss or for judgment on the pleadings.

On November 3, 2022, the Court issued a thirty-page order resolving the pending motions. (Doc. 119). That Order noted the Second Amended Complaint contained "no meaningful allegations of involvement" by five of the named defendants (Defendants Quigley, Manjarrez, Edwards, Saenz, and Adam). (Doc. 119 at 8). As supervisory defendants, the Court noted Fidler would need far more specific allegations of their personal involvement should she wish to pursue claims against them. (Doc. 119 at 9-10). But based on the allegations in the Second Amended Complaint, it was "obvious" these five defendants had to be dismissed. (Doc. 119 at 8). The Order further explained Fidler could not base her claims on Dr. Christensen's in-court testimony. The Court granted limited leave to amend and Fidler filed her Third Amended Complaint.

As already analyzed, the Third Amended Complaint attempts to allege claims against eight defendants based on an agreement to seek revenge against Fidler because of Dr. Christensen's embarrassment. This agreement is an entirely new basis for Fidler's various claims and is supported by allegations "upon information and belief."[7] Given the history of this case, these allegations are nothing more than speculation. It is appropriate to allege facts based on "information and belief" when a plaintiff "has obtained hearsay evidence or other secondhand information." *Martinez v. City of W. Sacramento*, 2021 WL 2227830, at *6 (E.D. Cal. June 2, 2021). Alternatively, "information and belief" allegations may be used to allege a broader pattern of events based on a "specific factual

---

[7] The Third Amended Complaint's inconsistency with prior complaints is not the basis for dismissal or for denying leave to amend. *See PAE Gov't Servs., Inc. v. MPRI, Inc.*, 514 F.3d 856, 860 (9th Cir. 2007) ("The short of it is that there is nothing in the Federal Rules of Civil Procedure to prevent a party from filing successive pleadings that make inconsistent or even contradictory allegations."). However, the fact that Fidler did not allege this wide-ranging agreement until her fourth attempt to state claims creates a unique "context" meriting additional skepticism regarding the plausibility of her allegations. *Eclectic*, 751 F.3d at 995 (noting courts must use "context-specific" analysis when determining plausibility).

- 16 -

example" identified in the complaint. *Waln v. Dysart Sch. Dist.*, 54 F.4th 1152, 1161 (9th Cir. 2022). It is not proper, however, for a plaintiff to allege events "upon information and belief" when the events are merely what plaintiff believes would be sufficient to support liability. For example, if Fidler knew Dr. Christensen had many conversations over a two-year period with his colleagues regarding E.F., she should have alleged factual details regarding those conversations. Baseless speculation that such conversations occurred is not enough. Inviting Fidler to amend and speculate anew would be futile.

Fidler is incapable or unwilling to plead sufficient factual allegations to state plausible claims for relief. Fidler has already filed four complaints and there has been very little meaningful clarification on why she is suing many of the defendants. In these circumstances, granting leave to amend would be futile.

Accordingly,

**IT IS ORDERED** the Motions to Dismiss (Doc. 140, 143, 147) are **GRANTED**. The Clerk of Court shall enter a judgment of dismissal with prejudice.

Dated this 3rd day of April, 2023.

Honorable Roslyn O. Silver
Senior United States District Judge